[Civ. No. 15319.  Second Dist., Div. One.  Dec. 6, 1946.]

MAURICE COSTELLO et al., Respondents, v. ALEX ROER et al., Appellants.

A. A. Rotberg for Appellants.

Ben H. Rudnick and Behrstock & Rudnick for Respondents.

DORAN, J.—The present action is one seeking rescission, on the ground of fraud, of a contract involving the purchase of a hotel business operated by appellant and sold to the respondents. The record discloses that negotiations therefor were commenced about September 24, 1943, culminating in a written agreement of sale dated September 30, 1943, under which the lease, equipment, etc. of the St. Mark's Hotel in Venice, California, were sold to respondents for $17,500 payable $7,000 down, balance in monthly installments. Respondents gave appellant a cashier's check for $5,000 which was duly paid and two checks for $1,000 each, payment of which was stopped. Another check for $282.74, covering adjustments in rent, etc. was also paid. Respondents operated the hotel until October 8, 1943.

The respondents' testimony was to the effect that during the initial conversations concerning the proposed purchase, appellant was informed that the purchasers desired a hotel of good reputation, and that ''The class of people that live in the hotel mean a good deal to us,'' to which appellant replied, ''You are buying a first class hotel, . . . If you buy this hotel you buy a legitimate business. I tried to work up a good class of people. I am careful not to permit any prostitutes or riffraff. The hotel has as good a reputation as any other first class hotel.'' Appellant was further asked, ''Do you always charge patrons according to OPA prices,'' and replied, ''Of course I do. Do you think I would be foolish enough to tangle with the Federal Government?'' It further appears that Mrs. Arlen Costello, wife of one of the purchasers, then said, ''Well, I want you to know that if you have been having trouble with the OPA or if we have to charge illegal prices in order to make a go of it, we just don't want the place,'' to which Roer replied, ''You don't have to worry your head about that, because I've always followed OPA rules strictly and made a good living out of it.'' The appellant first testified that no statement was made about the reputation of the hotel, but later said: ''They asked me about the reputation.

I said, 'We are living here about seven and a half years—— about seven years at that time. We always have a fine hotel, legitimate business. We have nice people coming in, registering. We also have families living in the hotel with boys.' "

According to respondents' testimony, after the money had been paid on September 30, 1943, and respondents had taken over the hotel, the appellant then, for the first time, imparted information indicating that the income, amounting to some $21,000 annually, was in part derived from overcharges in excess of OPA rates, exacted from soldier boys and others; and that at least one prostitute was not only tolerated in the hotel, but deemed a desirable tenant. This information included advice that unauthorized, extra, "service" charges could be safely made, and that "If you make up a good enough story they (OPA) wont bother you"; that sometimes double the OPA ceiling price would be charged,—the room occupant being checked in for one day and charged on the records for two days; that single guests were charged the double guest rate "by having him sign 'and wife', or 'party.' " In reference to the latter practice, Maurice Costello testified that, "A man came in who had a uniform on, either a sailor or a merchant marine, and asked for a room for himself. Mr. Roer said, "We have nothing but double rooms and we will have to charge you double. . . . Mr. Roer . . . told him to register his name 'and wife'. Mr. Roer smiled. 'Thats all right; you will find yourself some cutie on the beach.' . . . Mr. Roer said to me, 'See how easy it is? Thats the way to make a dollar'." The record discloses substantially similar testimony by Maurice and Albert Costello concerning appellant's reference to a prostitute occupant of the hotel. Maurice Costello testified to the following conversation with appellant after respondents had taken over the hotel:

"Then he pointed out a card for 'Bobbie Fafee' and told us in a quiet tone of voice, 'You might not like this girl, but she is a good customer. She is good for as many as six or seven rooms a day'; and my wife asked him 'What do you mean by that?' Mr. Roer said 'Don't be a baby. She is a prostitute.' I then said to Roer, 'I thought you sold us a legitimate hotel. We don't want to get into anything like this.' He answered like this, 'Don't be a damn fool. You will never make any money if you are going to be schlemiel.' I said, 'Well, I don't think we can do business that way in any hotel we are running.' "

Concerning the same conversation, Albert Costello testified that it took place "the very night we took possession. He broke in my brother how to operate the hotel, October 1st, the latter part of the afternoon. It was about four o'clock or so."

Respondents testified that on October 2, 1943, appellant was advised that the hotel had been misrepresented and that respondents desired to rescind. The respondents continued to operate the hotel, however, until October 8, 1943, at that time serving a notice of rescission upon appellant. Respondents then relinquished the hotel to appellant, a written agreement being executed which recited the claims of the respective parties and appellant's refusal to accept respondents' rescission or to refund the amount paid.

In reference to the alleged misrepresentation that OPA rules had been observed, Albert H. Schaeffer, hotel clerk between December, 1942, and April, 1943, testified that prices in excess of posted ceiling prices were charged "right along on week ends when Mr. Roer was with me on the desk"; further, that Roer said, "I get all the money I can while the getting is good." There was also evidence that in October, 1943, an accountant was engaged in auditing the hotel books in connection with an OPA investigation. The report of this accountant, submitted on October 22, 1943, showed, according to appellant's brief, a total of 567 violations and 60 registrations unaccounted for, covering a period between November 1, 1942, and May 5, 1943. Respondents further produced a letter, admittedly signed by appellant, dated October 9, 1943, addressed to the Office of Price Administration, reading in part as follows: "I hand you herewith check in the sum of $911.50. . . . This sum represents a voluntary contribution to the United States Treasury on my part. It represents the amount of overcharge collected by me in operating rental property at 15 Windward Avenue, Venice, California."

On October 22, 1943, respondents filed a complaint against appellant containing two counts; one for rescission and cancellation on the ground of fraud, the other for money had and received in the sum of $4,845.54, being the difference between the amount paid to appellant and receipts during the week the hotel was operated by respondents. After trial before a judge, a jury having been waived, the trial judge found that prostitutes had not been barred from the hotel and that at least one prostitute was allowed to use the hotel with appellant's knowl-

edge and consent; that at the time of the sale appellant was receiving excessive rentals in violation of OPA regulations; and that for approximately one year prior to the sale to respondents, the gross income of the hotel had not been obtained through its operation on a strictly legal basis, "but on the contrary had been obtained through the operation of said hotel in violation of law and the rules and regulations of the Office of Price Administration." Judgment was accordingly rendered in favor of respondents for rescission and cancellation, and for the amount claimed; from which judgment the present appeal is prosecuted.

The appellant's brief states the questions involved as follows: "Will a judgment rescinding a contract for fraud be affirmed on appeal where the findings are not supported by the evidence. and where no damage was proven and no finding of damage was made." The rule in reference to appellate consideration of this point is well known, and is stated in *Viner* v. *Untrecht*, 26 Cal.2d 261, 267 [158 P.2d 3], as follows: "It is fundamental that where a judgment is attacked on the ground that it is not supported, the power of the appellate court ends when it shall once have been determined that there is substantial evidence which will support the conclusions of the trial court." See, also. *Stromerson* v. *Averill*, 22 Cal.2d 808 [141 P.2d 732]; *Watson* v. *Poore*, 18 Cal.2d 302 [115 P.2d 478]. That the record in the instant case contains substantial evidence supporting a judgment for the respondents, cannot well be doubted. Although the alleged fraud was categorically denied by the appellant, the above mentioned rule still obtains.

Appellant's contention that "The representations were not material is without merit. Under the definitions of materialty contained in the cases cited by appellant, there can be no doubt that the alleged misrepresentations, if made by Roer, were "of such a .nature, weight and force that the court can say 'without it the contract would not have been made'." (*Oppenheimer* v. *Clunie,* 142 Cal. 313, 319 [75 P. 899].) As said in appellant's quotation from the Restatement of the Law, Restitution, section 8(2): "A misrepresentation is material if it would be likely to affect the conduct of a reasonable man with reference to the transaction in question." And, as pointed out in respondent's brief, the gist of the present controversy does not relate to the amount of the hotel income, but to the fact that such income was improperly derived. If respondents' testimony is to be believed, the legitimate source of the income

was a matter of primary importance to the purchasers, and the seller was directly so advised at the very inception of the negotiations. According to the appellant's own testimony, the purchasers were assured that "We always have a fine hotel, legitimate business. We have nice people coming in, registering." Had appellant then advised the Costellos that the income was in part derived from illegal overcharges, toleration of prostitute guests and falsification of records; that an OPA investigation was expected or pending; or, indeed, any one of such facts, it can hardly be doubted that such matter "would be likely to affect the conduct of a reasonable man with reference to the transaction."

The further contention that "No grounds for rescission exist unless material or appreciable injury are proven," and that plaintiffs failed to plead or prove, and the court failed to find, any such damage, cannot be sustained. There is evidence that the respondents did not get the kind of a hotel bargained for; moreover, the appellant retained $4,845.54 of the respondents' money. As said in 12 California Jurisprudence 766, "It is sufficient to show that the plaintiff is in a worse position than he otherwise would have been." In *Vulcan Fire Ins. Co.* v. *Jorgensen*, 33 Cal.App. 763, 767 [166 P. 835], it was held that misrepresentations that a certain bank president was to be connected with plaintiff company, "are sufficient to entitle the subscriber to rescind, without proof of pecuniary damage suffered," the court observing that this rule "is well settled." This language was quoted with approval in *Munson* v. *Fishburn*, 183 Cal. 206, 218 [190 P. 808]. In this connection it may be noted that section 1689(1) of the Civil Code, relating to rescission, merely requires that "the consent of the party rescinding or of any party jointly contracting with him, was given by . . . fraud," and contains no requirement for a showing of damage. The case of *Powell* v. *Rockow* (1933 Tex. Civ.App.), 58 S.W.2d 536, 538, cited by respondents, is not dissimilar to the instant controversy. There the plaintiff purchased a hotel business upon fraudulent representations that the hotel had a lucrative patronage, and that its patrons were of good reputation. It was there held that the purchaser might rescind, and the court said: "There is no merit in the contention that appellees had to show a loss before they could have rescission of the contract. They contracted for a decent hotel, and under their testimony the Angelus Hotel was noth-

ing more than a cheap bootlegging joint and assignation house.''

The defendant has also appealed from an order denying a motion to tax costs by striking an item of $150 from plaintiff's cost bill, claimed as a commissioner's fee for the taking of the depositions of Maurice Costello and Arlen Costello at Norfolk, Virginia. As noted in respondents' brief, section 1032a of the Code of Civil Procedure provides that a party shall be allowed as costs the reasonable cost of taking and transcribing depositions. The appellant's motion to strike this item merely alleged that it was not a ''proper item of costs chargeable in this action,'' and did not claim that the amount was unreasonable. Appellant's brief now appears to concede that the item was proper but that the amount allowed was not reasonable. As appellant states, ''On the motion to tax costs, the court had before it all the pleadings, files and papers in said action and the minutes of the court. The depositions were on file. The Cost Bill showed the expense of the shorthand reporter who took and transcribed the deposition.'' This statement, itself, is an answer to the contention, and it must now be assumed that, in passing on this matter, the trial court gave due consideration both to the propriety of the item and the amount of the charge. If appellant's objection was that the charge was unreasonable, the motion should have been one to reduce the amount, with a proper showing in that regard.

For the reasons hereinbefore stated, the judgment and order appealed from are affirmed.

York, P. J., and White, J., concurred.