[No. B114125. Second Dist., Div. Four. Mar. 26, 1998.]

HARRY BROWN, Plaintiff and Appellant, v.
FSR BROKERAGE, INC., et al., Defendants and Respondents.

**COUNSEL**

Asaro, Keagy, Freeland & McKinley and Steven A. McKinley for Plaintiff and Appellant.

Loeterman, Shulkin & Kraemer and Samuel H. Kraemer for Defendants and Respondents.

**OPINION**

**EPSTEIN, J.**—Common sense and ancient wisdom join the law in teaching that an agent is not permitted to simultaneously serve two principals whose

interests conflict about the matter served—at least, not without full disclosure and consent from both. In the context of brokered real estate transactions, this principle is codified in Civil Code sections 2079.14 and 2079.16, which we shall discuss. Defending against a motion for summary judgment, Harry Brown, the plaintiff in this case, presented evidence that: He wanted to sell residential real estate he owned; dealt with an agent and broker who, without his knowledge, also represented the buyer; was unaware of the dual agency until after the transaction had been completed; and upon learning about it, he promptly sued the agent and broker for monetary damages. The defendants were successful in their motion for summary judgment, and Brown appeals.

No issue is presented to us as to the scope of monetary relief, if any, to which Brown may be entitled should he be able to prove his case. Defendants obtained summary judgment on two bases: that they did disclose the dual agency, and that, in any case, they are not responsible for any monetary damages suffered by Brown because he is the author of his own problems. We find a triable issue of material fact as to each of these issues, compelling reversal of the ensuing judgment. We need not and do not decide whether the seller would be entitled to damages for the nondisclosure alone.

## Factual and Procedural Summary

Harry Brown, the seller, was the plaintiff in the trial court proceedings, and is the appellant here. The defendants are FSR Brokerage, Inc., a California corporation doing business as Fred Sands Estates (FSR), and Sid Kibrick. FSR is a licensed real estate brokerage, and Kibrick is a licensed real estate salesperson working under FSR's broker's license.

We take our summary from the summary judgment papers: depositions, declarations, and documents referenced in the moving and opposing separate statements.

Brown acquired the subject property, a large residence in Beverly Hills, on January 13, 1994. Some three months later, in April 1994, he listed it for sale with another broker. The asking price was $3,950,000. Over the course of the next 20 months, Brown successively reduced the listing price for the property, and relisted it. By June 1995 the asking price had been dropped to $2,895,000.

Brown gave an exclusive listing to FSR on December 19, 1995, with a listing price of $2,695,000. The selling price was eventually reduced to $2,495,000. The listing agents, each of whom was employed by FSR, were

Barbara Tenenbaum and Sid Kibrick. Brown had met Tenenbaum and, through her, had agreed to list the property with FSR. It turned out that Tenenbaum had a partnership arrangement with Kibrick, through which each was a listing agent on any property listed by the other.

The listing with FSR was extended, and was in force in May and June of 1996. Up to then, Brown had not received a single written offer to buy the property since its initial listing more than two years before. On May 31 or June 1, 1996, Kibrick brought over a prospect who, he told Brown, was interested in the property. That was Bernard Lafferty, about whom more will follow.

On leaving the residence, Kibrick told Brown that he expected that Lafferty would return with an offer. Kibrick and Lafferty returned later that day, or the next day. Lafferty was accompanied by an attorney, John D. Forbess. Ms. Tenenbaum also was present.

Kibrick took Brown aside for a private conversation. Brown did not want to come below $2,495,000. Kibrick insisted that he lower the price to $2.4 million and said he would lose the buyer if he did not. "He was very convincing and he told me in the course of the discussion that he was working exclusively for me and only had my interests in mind. I felt reassured by this statement, and comfortable, although reluctant, in allowing myself to be persuaded by him that I should reduce the price to $2.4 million. I thereupon decided I would accept $2.4 million from the buyer. I never communicated this price until after Mr. Kibrick had persuaded me as set forth above." Kibrick told him that the buyer would not pay more than $2.4 million.

Besides trying to buy the property for a lower price, Lafferty insisted on a most unusual term of sale: Brown had to vacate the residence so that Lafferty could move in, in less than a week.

In the same conversation as the one in which Kibrick asked Brown to agree to the $2.4 million price, or in a different discussion—Brown was not sure which—Tenenbaum urged Brown to hold to the $2,495,000 price "because there's nothing else like it [the house] on the market. These people need the house, they want it in three days, which is unheard of. There's nobody else in the whole city that could deliver a house in three days like you can. You should get your full price" she said, "first of all, because it's worth it." (At one point, Tenenbaum suggested to Brown that he consult his own lawyer, pointing out that Forbess was Lafferty's attorney. Apparently, she undertook to furnish Brown with the name of an attorney, but by the time the person called, the deal had been completed.)

Brown decided to follow Kibrick's advice. During the negotiations, Kibrick said, "he was working exclusively for me," that "I'm trying to get you the best price I can." In his conversation with Brown, Kibrick repeatedly said that he was working exclusively for Brown. The day before (a Saturday), Kibrick told Brown, in the presence of Brown's girlfriend, "that he was working exclusively for us and the price and everything that he can get, it was just me, my girlfriend and him."

Brown thought the residence was worth $2,495,000. Asked at deposition why, in light of this, he agreed to accept $2.4 million he replied: "Because Sid Kibrick, working exclusively for me, for the fifteenth time, told me that this is the best he's going to get and I'm going to blow the deal. He was the one promoting the two million four." (The reference to the "fifteenth time" is apparently a sarcastic comment that this or similar questions had been asked before at the deposition.) Again, asked why he did not simply say that $2.4 million was not good enough, Brown said that Kibrick "told me that he's working exclusively for me and he said he's been working on two million three fifty and it's the best he's going to get, he's not going to get any more. That's what he told me." Brown agreed to the price urged by Kibrick "[b]ecause I assumed he was working for me exclusively and this was the best he was going to get. That's what he told me, and he's my goddamn broker, okay?"

Forbess thought the property was worth less than $2.4 million and that "there was not a prayer in the world that [Lafferty would have paid] more than $2.4 million because he would—he would basically have to have beaten me up to get me to agree to it." Forbess also testified that while he realized it would be difficult for Brown to complete the sale, pack up and leave within a week ("almost an impossible undertaking"), Lafferty "was at a state of urgency in his own life, and if that sale was to take place it had to take place on those terms." Lafferty was, in fact, "almost at the point of a nervous breakdown, considering his position of not having a house and having his dogs—I think there were 11—and of which he was extremely fond, and all of which who were in a boarding facility or pound of some sort and not doing well physically. They were sick, some of them were sick and he was very concerned that they were going to start dying on him." And while Mr. Doyle, Lafferty's Chicago lawyer, was concerned about paying $2.4 million, Forbess understood that Lafferty "perceived that he was the client and had the ultimate say in the matter, and he told us that he didn't care what we said, what our advice was, that he was going to buy the place."

On Sunday, Brown agreed to the $2.4 million price. According to Forbess, Brown told him directly that he would not sell for the $2,350,000 then

offered, and would not take less than $2.4 million. Brown denied saying this to Lafferty or to Forbess.

The next day, June 4, 1996, Tenenbaum told Brown that it was time to go to escrow, and they did. Up to then, there was no written offer or signed agreement for purchase and sale of the residence. At the escrow office, Brown signed documents presented to him by Tenenbaum for execution. Tenenbaum identified the escrow instructions and asked Brown to sign them. Brown looked at the first page, saw that the agreed-upon purchase price was correctly stated, and read nothing more. He signed or initialed each of the succeeding pages and attachments as indicated. One of the attachments he initialed was a document entitled "Real Estate Agency Relationships." Paraphrasing the statute, it states the duties of the seller's agent and the buyer's agent, and then deals with the case where the same agent represents both. That is legal, it states, only with the knowledge and consent of both seller and buyer. The dual agent has "a fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer," and may not, without express permission, disclose to the buyer that the seller will take less than the listing price, or that the buyer will pay more than the amount offered. Tenenbaum gave this document to Brown and directed him to sign it, but he did not know what it was. He thought it was merely a form to facilitate consummation of the transaction.

Paragraph 17 of the escrow instructions, located at page 16 of that document, recites that "Fred Sands Estates is the agent of both the Buyer and the Seller. Sid Kidbrick [sic] and Barbara Tenenbaum are the listing agents and Sid Kidbrick [sic] is the selling agent." Another document, titled "Commission Instructions," instructed escrow to pay FSR $120,000 in commissions, and stated: "Listing agents (Sid Kibrick/Barbara Tenenbaum) shall receive $60,000.00. [¶] Selling agent (Sid Kibrick) shall receive $60,000.00." Brown initialed these pages, but did not read them. There was no discussion about them.

Kibrick heard from Doyle, the Chicago attorney apparently in charge of Lafferty's legal representation, on the evening of Friday, May 31, 1996. Doyle said that his client, Lafferty, wanted a home and was unhappy with the brokers with whom he had been dealing for the last nine months. According to Kibrick, Doyle "wanted me to roll up my sleeves and try to find him a house to lease for him and his 11 dogs." Asked, "So it was your understanding that Mr. Lafferty wanted to stop using the services of his other brokers and start using your services," Kibrick answered, "That's correct." That was the understanding he gained from his discussion with

Doyle, "[a]nd the following day, when Mr. Lafferty—he expressed the same thing to me."

Kibrick met with Forbess, learned what the Lafferty side wanted to pay and gained an understanding of what it would pay, and promised Forbess to try to work Brown down to $2.4 million. He specifically told Forbess that if Lafferty would offer $2.4 million he thought Brown would accept it.

Kibrick declared that when he showed the property to Lafferty, Kibrick "verbally told plaintiff Harry Brown that I was representing Mr. Lafferty." As we have seen, Brown denies this. According to Brown, he learned of the dual agency from his girlfriend, several days after the close of escrow, when she was leafing through the transaction documents. He had never consented to a dual agency.

Brown filed suit against FSR and Kibrick in August 1996. The issue was joined and, after discovery, defendants moved for full summary judgment. The motion was opposed and was ultimately granted. The granting order shows the name and address of defendants' counsel in the upper left corner, indicating that it is an attorney-drawn document. In it, the court states that the evidence submitted establishes that FSR advised Brown that it was acting as a dual agent and not to accept less than the listing price for the property, but that Brown himself directly told the buyer what his bottom price was. As a result, the court concluded, FSR breached no duty to Brown and did not cause him any damage.

Judgment was duly entered, and a timely notice of appeal was filed.

## DISCUSSION

■ The principles that govern summary judgment motions are fully known, and need not be reprised in detail. It is sufficient to say that when the motion is for full summary judgment by a defendant, it is necessary to negate at least one essential element of each of the plaintiff's causes of action, and that the moving party's papers are strictly construed and those in opposition construed more liberally. Doubts are resolved against granting the motion. (See *Van Dyke* v. *Dunker & Aced* (1996) 46 Cal.App.4th 446, 451 [53 Cal.Rptr.2d 862], and cases cited.)

Civil Code section 2079.14, a 1995 statute that was in force at the time of the representation and acts at issue here, provides:

"Listing agents and selling agents shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in

Section 2079.16, and, except as provided in subdivision (c), shall obtain a signed acknowledgment of receipt from that seller or buyer, except as provided in this section or Section 2079.15, as follows:

"(a) The listing agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement.

"(b) The selling agent shall provide the disclosure form to the seller as soon as practicable prior to presenting the seller with an offer to purchase, unless the selling agent previously provided the seller with a copy of the disclosure form pursuant to subdivision (a).

"(c) Where the selling agent does not deal on a face-to-face basis with the seller, the disclosure form prepared by the selling agent may be furnished to the seller (and acknowledgment of receipt obtained for the selling agent from the seller) by the listing agent, or the selling agent may deliver the disclosure form by certified mail addressed to the seller at his or her last known address, in which case no signed acknowledgment of receipt is required.

"(d) The selling agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase, except that if the offer to purchase is not prepared by the selling agent, the selling agent shall present the disclosure form to the buyer not later than the next business day after the selling agent receives the offer to purchase from the buyer."

The referenced provision, Civil Code section 2079.16, provides:

"The disclosure form required by Section 2079.14 shall have Sections 2079.13 to 2079.24, inclusive, excluding this section, printed on the back, and on the front of the disclosure form the following shall appear:

"DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP
(As required by the Civil Code)

"When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

"SELLER'S AGENT

"A seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:

"To the Seller:

"A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Seller.

"To the Buyer and the Seller:

"(a) Diligent exercise of reasonable skill and care in performance of the agent's duties.

"(b) A duty of honest and fair dealing and good faith.

"(c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties.

"An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

### "BUYER'S AGENT

"A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:

"To the Buyer:

"A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Buyer.

"To the Buyer and the Seller:

"(a) Diligent exercise of reasonable skill and care in performance of the agent's duties.

"(b) A duty of honest and fair dealing and good faith.

"(c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

"AGENT REPRESENTING BOTH SELLER AND BUYER

"A real estate agent, either acting directly or through one or more associate licensees, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.

"In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:

"(a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.

"(b) Other duties to the Seller and Buyer as stated above in their respective sections.

"In representing both Seller and Buyer, the agent may not, without the express permission of the respective party, disclose to the other party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered.

"The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

"Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction.

"This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on the reverse hereof. Read it carefully.

| Agent | (date) | Buyer/Seller (Signature) | (date) |

| Associate Licensee (Signature) | (date) | Buyer/Seller (Signature)" | (date) |

■ The duty of a real estate agent to faithfully represent the interests of his or her principal, and to make full disclosure of adverse interests, long antedated this statute. Breach of these duties may result in loss of the right to compensation. (See *Baird* v. *Madsen* (1943) 57 Cal.App.2d 465, 475 [134 P.2d 885]; *Sierra Pacific Industries* v. *Carter* (1980) 104 Cal.App.3d 579, 582 [163 Cal.Rptr. 764].)

■ It should be noted that the statute requires disclosure to the seller "as soon as practicable *prior* to presenting the seller with an offer to purchase" unless disclosure already had been made. (Civ. Code, § 2079.14, subd. (b), italics added.) The contemplated disclosure is to be in writing. The only written disclosures in this case were made when the escrow instructions were signed. Kibrick claims to have informed Brown, orally, that he was representing Lafferty when he first brought Lafferty over to see the property. But Brown denies that this occurred, leaving an unresolved triable issue of material fact.

The trial court emphasized evidence that Brown took charge of the negotiations himself, and personally informed Forbess of his bottom-line price. Again, Brown denies it, leaving the issue unresolved and unresolvable for purposes of summary judgment. But even if the claim were to be credited, it would not resolve the issue in respondents' favor. According to Brown, it was Kibrick who talked him into agreeing to the $2.4 million price, against Brown's better judgment. He did this, again according to Brown's evidence, while repeatedly reassuring Brown that he was acting for Brown alone, and without disclosing that he also was acting for Lafferty. He particularly did not disclose that he had promised Forbess to try to talk Brown down to $2.4 million and that he had informed Forbess that that was as low as Brown would go.

Even in a consented dual agency situation, the statute specifically forbids the agent from disclosing to the buyer, without express permission from the seller, that the seller will accept less than the listing price. (Civ. Code, § 2079.21.) Based on Forbess's testimony, that is substantially what Kibrick did.

Respondents argue that the documents signed or initialed by Brown include adequate disclosures, and that it was his decision not to read them. ■ It is, of course, true that "[w]hen a person with the capacity of reading and understanding an instrument signs it, he may not, in the absence of fraud, coercion or excusable neglect, avoid its terms on the ground he failed to read it before signing it." (*Bolanos* v. *Khalatian* (1991) 231 Cal.App.3d 1586, 1590 [283 Cal.Rptr. 209].)

■ There are at least two reasons this doctrine is not sufficient to secure victory to respondents. First, the statute and common sense require that the dual agent call attention to the fact of dual agency, and Brown has submitted substantial evidence that they failed to do so. He was not on notice that any of the documents he signed or initialed was anything other than a routine instrument technically required for consummation of the sales transaction. Second, by the time the escrow papers were being signed, Brown already had "broken" his price: he could hardly then demand a greater price, particularly since, so far as the record discloses, the buyer was guilty of no impropriety except through his dual agent.

■ Respondents argue, and convinced the trial court, that disclosure would not have made a difference because Lafferty would not have paid more than $2.4 million. They cite Forbess's testimony at deposition that Lafferty would have had to fight Forbess in order to go higher. There is, however, substantial evidence that a higher price would have been achieved. First, the asking price of $2,495,000 is only 3.8 percent greater than the sales price. Second, Lafferty had an urgent need for a suitable residence to house himself and his passel of dogs: He was demanding occupancy for himself and ouster of the resident-owner, all within a few days. Third, Lafferty himself had made it clear to Forbess that it was his money and that he was going to buy the place.

Finally, respondents argue that appellant Brown has waived his claims because he did not seek to rescind the real estate transaction. They cite two cases. Neither supports them. The first, *Vice* v. *Thacker* (1947) 30 Cal.2d 84 [180 P.2d 4], is a dual agency case in which the seller *did* rescind. The case does not deal with remedies other than those related to rescission. The other case, cited as a "see also," is *Gordon* v. *Beck* (1925) 196 Cal. 768 [239 P. 309]. It too deals with the right to rescind and nothing else. Brown has not sought to rescind the sale of his property to Lafferty. We see no reason why he was compelled to seek rescission. He has, instead, chosen to sue the dual agent, Kibrick, and the broker, FSR, for losses he claims to have suffered because he relied on their advice unaware that they were representing both sides of an adversarial transaction.

We end our discussion as we began it: To the degree Brown can prove a monetary loss on account of actions and failures to act by respondents, he is entitled to appropriate monetary recovery. The amount is not an issue before us, and we do not address it. We hold, only, that respondents were not entitled to summary judgment and that appellant is entitled to have the ensuing judgment in their favor reversed.

DISPOSITION

The judgment is reversed. Appellant is to have his costs on appeal.

Vogel (C. S.), P. J., and Czuleger, J.,* concurred.

---

*Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.