Filed 7/19/13  GSF Enterprises v. Victorville Mediterranean Gardens CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GSF ENTERPRISES, INC., | D060067 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2010-52151-CU-BC-NC) |
| VICTORVILLE MEDITERRANEAN GARDENS, LLC, et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert P. Dahlquist, Judge.  Affirmed.

Klinedinst; Gates, O'Doherty, Gonter & Guy and Amanda F. Benedict for Defendant and Appellant.

Lanack & Hanna and Christopher M. Cullen for Plaintiff and Respondent.

Plaintiff and respondent, GSF Enterprises, Inc. (Plaintiff or GSF), sued Victorville Mediterranean Gardens, LLC ("VMG"), Executive Information Services and Investment Group, LLC ("EISIG"), and the majority owner of those companies, Larry D. Gonzales (Gonzales; sometimes together, Defendants), over Defendants' defaults in repaying two

notes that were collateralized by two pledge agreements for stock in VMG and EISIG. Plaintiff sought rescission and damages on fraud, breach of contract, and other theories. (Civ. Code, § 1689, subd. (b)(1), (2); all further statutory references are to the Civil Code unless noted.)

After a bench trial, Plaintiff obtained judgment in its favor on the cause of action for rescission of the notes and their related pledge agreements, due to fraud, and it also prevailed on two causes of action for declaratory relief, to establish Gonzales was the alter ego of VMG and EISIG. Judgment was entered for $250,000 collectively against Defendants.

Defendants appeal, arguing there was insufficient evidence presented to establish that Plaintiff "was actually deceived by the concealment or misrepresentation of any material fact or that [Plaintiff] actually relied upon the fraudulent representation when it consented to the funding agreements." The record is otherwise. The judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

A. Parties and Transactions

Gonzales is a real estate developer and the principal of several companies and proprietorships. As relevant here, he is the president and chief executive officer of EISIG (a Nevada corporation admitted to do business in California), and he owns 75 percent of EISIG's shares. EISIG's assets are mainly $2.2 million in the form of receivables from stockholders or two companies who owe it money. EISIG owns Topaz Capital and

Investments, Inc., a Nevada corporation (Topaz). Topaz held the title to 52 acres of real property near Victorville, California.[1]

Since 2004, Gonzales has been working on a development project on the Topaz-owned property, "Victorville Mediterranean Gardens," a projected 428-unit multifamily complex (the project). EISIG, a holding company, also owns VMG, an entity to be used for the development of the project. VMG's 2009 operating agreement lists Gonzales as the sole member. At trial, Gonzales estimated the projected potential returns on the project were between $60 million to $80 million.

In 2007, Gonzales, through his company EISIG, applied for a loan guarantee for the project from the United States Department of Housing and Urban Development (HUD). He planned to transfer title of the project property into VMG, once funding was obtained. On January 2, 2008, Gonzales obtained a letter from HUD (letter of invitation) authorizing the submission of an application to obtain a "firm commitment" of a HUD loan guarantee. The letter of invitation was due to expire 180 days later, and could be extended for another 90 days.

However, the letter of invitation expired in 2008 before Gonzales could complete his application for a firm commitment. Gonzales kept trying to move the project forward and to obtain a HUD loan guarantee, possibly by reapplying for another letter of

---

[1] In March 2011, at the time of trial, Topaz was a debtor in a Chapter 11 bankruptcy proceeding. Topaz had sold off over 16 acres of the project by then. It is not a party to this litigation.

invitation. By 2009, the property was overleveraged and Topaz was behind on its monthly mortgage payments.[2]

Plaintiff, a Delaware corporation, owns a framing business. Its president, John C. Dunbar, has over 20 years of experience in construction and related industry financing. In May of 2009, Dunbar was introduced to Gonzales by a mutual business associate, Rick Cohen of Jaynes Construction (Jaynes, a general contractor). The three men met to discuss a project that Gonzales was working on, along with Plaintiff's vice-president Gary Viano, Gonzales's associate Roy Peterson and others. At the meeting, Gonzales explained the VMG project concept, discussed the participating companies he controlled, and stated that they needed a limited amount of funding to help move VMG's project forward, by obtaining required permits and fees. Plaintiff was interested in bidding for the framing portion of the project, through Jaynes, and later did so. Dunbar understood from Gonzales that Jaynes was also a potential investor.

### B. Documentation of Deal

After the meeting, in May 2009, Plaintiff agreed to pay VMG money, in return for a security interest in one of Gonzales's companies as collateral. First, Plaintiff signed a "Note Agreement" (the note) and a "Pledge Agreement," and paid $150,000 to VMG. In the note, VMG warranted and pledged collateral of 600 shares of stock in VMG to Plaintiff "with the understanding that said shares/stock will be repurchased/redeemed by VMG when payment is returned for principal plus 15% interest with the note paid off in

---

[2]    As of the time of trial, the HUD application process had not been completed, no ground had been broken on the project, and Gonzales was planning to cut its size in half.

4

full in six months." In the note, VMG warranted that the funding was for "securing a HUD loan guarantee to build a 428-unit multifamily complex in Victorville, California." The due date on the note was November 22, 2009. Additionally, the note provided that in the event of default, "both parties agree that pledged shares/stock of VMG in the amount of this Agreement will become certificates of shares/stock in" VMG, and VMG would have a right of redemption within six months.

The separate pledge agreement by VMG referenced the note and stated that the pledge agreement supplied collateral and security for the payment and obligations under the note.

In June 2009, Plaintiff signed a similar note and pledge agreement, this time in favor of EISIG, and paid an additional $100,000 in funding towards the project. The due date on this note was July 25, 2009. In the note, Plaintiff agreed to receive a security interest in EISIG as collateral, and EISIG agreed "to warrant and to pledge as collateral four hundred (400) shares/stock of EISIG" to Plaintiff, "with the understanding that said shares/stock will be repurchased/redeemed by EISIG when payment is returned for principal plus 15% interest with the note paid in full within thirty (30) days of the date of execution (below)." Again, the note warranted that the funding was to be used for "securing a HUD loan guarantee to build [the project]," and the pledged stock constituted a security interest for the capital provided, and EISIG would be repurchasing the security interest. Additionally, this note provided the same type of default provision as above, which allowed the pledged stock to become certificates of stock in EISIG upon any default, and EISIG would then have a right of redemption within six months.

5

The separate pledge agreement by EISIG included a stock issuance table, referenced the note, and stated that the pledge agreement supplied collateral and security for the payment and obligations under the note.

VMG, EISIG and Gonzales spent the money, stopped communicating with Plaintiff in October 2009, did not pay the notes and did not transfer the stock.

### C. Lawsuit, Trial and Judgment

In March 2010, Plaintiff filed a complaint seeking to rescind the notes and pledges of stock based on (a) failure of consideration or (b) fraud, and sought restitution and damages for breaches of contract, declaratory relief and an accounting.[3] Copies of the notes and pledges of stock were attached to the complaint. Defendants answered and discovery ensued.

In February 2011, Plaintiff's motion to amend its complaint was denied and the matter proceeded to trial in March 2011. Initially, Defendants sought dismissal on the grounds that Plaintiff was doing business in California as "Golden State Framers," but that was a suspended corporation. (Rev. & Tax. Code, § 23301 [suspended corporations cannot exercise corporate powers].) However, the trial court denied dismissal, because the body of the complaint made it clear that the plaintiff in the matter was GSF, not its dba, and GSF was in good standing.

---

[3] Subdivision (b)(2) of section 1689 allows for rescission of a contract when "the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 935, pp. 1029-1030.)

At trial, the parties and their associates Viano and Peterson testified about their understandings of the role of the HUD letter of invitation, the financial condition of Gonzales's various companies, the identity of the title holder to the project's property, and the planned use of the money from Plaintiff (as described in the discussion portion of this opinion). Numerous exhibits were admitted, mostly by stipulation.

After taking the matter under submission, the court issued its ruling in the form of a minute order and "Decision after Bench Trial" (the decision). The court first determined that insufficient evidence had been presented to support the cause of action for rescission due to failure of consideration. The court ruled that Plaintiff had abandoned its fifth cause of action for an accounting.

After explaining its reasoning process in detail (to be summarized *post*), the trial court ruled in favor of Plaintiff on its cause of action for rescission due to fraud, and on the two causes of action declaring Gonzales the alter ego of VMG and EISIG. No ruling was deemed necessary on the breach of contract claims. The court ordered VMG to pay Plaintiff $150,000 and EISIG to pay it $100,000. Gonzales was held personally responsible for payment of the same amounts, under the doctrine of alter ego, in the combined amount of $250,000.[4] Plaintiff was required to prepare a form of judgment, which was entered.

The court denied Defendants' request for reconsideration on May 23, 2011. Defendants appeal.

---

[4] On appeal, Defendants have not made any specific arguments to attack the alter ego findings in the decision and judgment, and have waived any such claims.

7

DISCUSSION

I

*APPLICABLE STANDARDS*

A.  Review on Appeal

This decision was issued after the trial court heard testimony and reviewed the exhibits to resolve the issues identified in the pleadings and trial briefs, and it was duly formalized into a judgment.  In reviewing such a decision after trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision."  (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358.)  The ultimate facts found in the court's decision, which is equivalent in this case to a statement of decision, necessarily include findings on the intermediate evidentiary facts that sustain them.  (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125.)

The appellate court will "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]."  (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.)  "Substantial" evidence has " 'ponderable legal significance, . . . [and is] reasonable in nature, credible, and of solid value.' "  (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873, italics omitted.)  In determining its existence, we look at the entire record on appeal rather than simply considering the evidence cited by a party.  (*Ibid.*)  We may not reweigh the evidence and are bound by the trial court's credibility

8

determinations.  (*Ibid*.; see *Heller v. Pillsbury Madison & Sutro* (1996) 50 Cal.App.4th 1367, 1384.)

## B.  Rescission for Fraud

Under section 1689, subdivision (b)(1), a contract may be rescinded:  "If the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake, or obtained through duress, menace, *fraud*, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party."  (Italics added.)  In *Estate of Young* (2008) 160 Cal.App.4th 62, 79, this court considered a substantial evidence challenge to an adverse fraud judgment by first reviewing the required elements of a claim of fraud: " ' "(a) a misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."  [Citations.]' "

"Actual fraud is always a question of fact."  (§ 1574.)  Within the definitions of section 1572, fraud can take numerous forms:  "Fraud is a generic term which embraces all the multifarious means which human ingenuity can devise and are resorted to by one individual to get an advantage over another.  No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and unfair ways by which another is deceived.  [Citation.]  The statutes of California expressly provide that . . . any other act fitted to deceive is actual fraud."  (*Wells v. Zenz* (1927) 83 Cal.App. 137, 140; see 1 Witkin, Summary of Cal. Law, *supra,*

9

§ 286, p. 316.)  A fraudulent representation is one made "with intent to deceive" the other party to the contract.  (§ 1572; 1 Witkin, Summary of Cal. Law, *supra*, § 290, p. 318.)

### C.  Materiality of a Misstatement or Concealment

A representation that is material, or goes to the heart of an agreement, is one of " 'such a nature, weight, and force that the court can say, "without it the contract would not have been made." ' "  (*Costello v. Roer* (1946) 77 Cal.App.2d 174, 178, citing *Oppenheimer v. Clunie* (1904) 142 Cal. 313, 319.)

Determining the materiality of a false representation presents a question of law that is related to the concept of justifiable reliance.  (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 718, pp. 134-135.)  "The facts of materiality are shown by the specific allegation of the representation contrasted with the true facts."  (*Id*. at p. 135.)  This commentator explains that a plaintiff seeking redress for fraud must be able to prove that there was actual, justifiable reliance on the false representations.  (*Id.* at § 732, pp. 152-154.)  "This may in some cases require a showing of such matters as materiality of representations of fact, circumstances warranting reliance on opinions, or the absence of a duty to investigate or of the means of obtaining other information."  (*Ibid*.)

As Defendants acknowledge in their reply brief, "the existence of a single material misstatement or concealment of a material fact can be sufficient ground for rescission of a contract.  (*Wilke v. Coinway, Inc.* (1967) 257 Cal.App.2d 126[, 138]; *Richard v. Baker* (1956) 141 Cal.App.2d 857, 861.)"  We now turn to Defendants' specific claims that under all the relevant circumstances, no "material" facts were misstated or concealed,

10

such as the topics identified by the trial court as critical to the Plaintiff's decision to enter into these contractual arrangements.

## II

## *SUFFICIENCY OF EVIDENCE: RESCISSION FOR FRAUD*

### A. HUD Letter of Invitation

#### *1. Ruling*

The trial court's decision characterized the testimony by Dunbar, on behalf of Plaintiff, as showing that Gonzales failed to disclose that he had been unsuccessful in obtaining a HUD loan guarantee, or that his letter of invitation to do so had already expired. On the other hand, Gonzales had testified that all material information about the project was disclosed, and that Plaintiff was only now complaining, after the fact, about matters that were immaterial to it at the time.

In the decision's findings and analysis, the court observed that the testimony offered for Plaintiff by Dunbar, concerning the disclosures and representations made by Defendants, was generally credible and established that Plaintiff was misled in connection with the funding it provided to them. The court then stated that Gonzales's testimony about his disclosures and representations was "not entirely credible." The totality of the evidence persuaded the court that Plaintiff should have been but was not told that the HUD letter of invitation had lapsed many months before Plaintiff paid the money to VMG or EISIG.

11

## 2. *Contentions, Evidence and Analysis*

Defendants contend that the evidence does not support the trial court's determination that this factor was "material" and influenced Plaintiff's decision to enter into the notes and pledge agreements. Defendants argue Plaintiff did not diligently investigate the "investment," and that any misrepresentation was not an inducing cause of the assent. (See 1 Witkin, Summary of Cal. Law, *supra*, § 300, p. 326.) Rather, Defendants claim Plaintiff was investing in the project out of its own self-interest, in seeking to supply a framing bid for it.

Plaintiff responds that the transactions were intended on its part to be loans that would be repaid according to the terms specified on the notes, with collateral provided by the pledge agreements. Plaintiff understood that the project was in the permitting stage and that governmental entitlements had to be obtained and fees paid, and Dunbar testified that he understood the transaction to be a bridge loan toward such expenses, rather than an investment. Dunbar testified that Gonzales told him that the purpose of the second loan was to tie up loose ends, such as paying for permits and fees. Later, Gonzales told Plaintiff that he would be able to pay it back, once the next $1.5 million in investment he was expecting came in, although it never did.

We are required to look at the entire record on appeal rather than simply considering the evidence cited by a party. (*Bowers v. Bernards, supra,* 150 Cal.App.3d 870, 873.) We do not reweigh the evidence and are bound by the trial court's credibility determinations. (*Ibid*.) From all of the testimony and evidence, the trial court had a sufficient basis to determine that it was a material fact, important to Plaintiff's contractual

12

decisionmaking, whether the project was currently and actively underway, with respect to pursuing eligibility for governmental funding approvals. Such information was withheld. Without a viable project, Plaintiff could not have expected its planned bid for the framing work to be accepted, and more probably than not, it would have declined to contribute toward any hypothetical request for such approvals.

The record does not support Defendants' arguments that Plaintiff was given the necessary information about the project but failed to investigate it adequately. The trial court had an adequate basis to rule that there were material misrepresentations and concealments in Defendants' presentation to Plaintiff, in this respect.

## B. Financial Condition of Companies

### 1. Ruling

The trial court's decision characterized the testimony by Dunbar, on behalf of Plaintiff, as credibly claiming that Gonzales failed to disclose, as of the time that Plaintiff was deciding to advance money to the project, that the project was in financial distress. Defendants owed money to their lender and to other creditors that they could not pay.

### 2. Contentions, Evidence and Analysis

Defendants argue that Plaintiff was made aware of all the relevant facts about the transactions and proceeded to invest, for reasons of its own. Defendants argue that further disclosures would not have made a difference because Plaintiff did not investigate the current financial status of VMG or EISIG, instead relying on the business reputation of Gonzales as conveyed by their mutual colleague, Rick Cohen of Jaynes. Dunbar testified that Gonzales "pitched" the project to him and Dunbar had a "hunch" that this

13

would be a good deal for his company. He understood from the presentation that Gonzales owned the property, which was unencumbered, and that Gonzales had several of his own entities involved in the project, but there was no need to discuss the assets of those entities. Dunbar did not believe it made any difference that one of the notes involved VMG and the other involved EISIG, since EISIG owned VMG, and Gonzales said they were moving forward with his HUD project on his property.

Gonzales testified that in addition to EISIG, which had been a defunct Nevada corporation during 2008-2011 (but was still doing business in California), he also owned a sole proprietorship/dba called EIS (Employee Insurance Services; not a party to this action), and the stockholders of EISIG owed money to EIS. Gonzales transferred money between his various entities for the purpose of making payments on behalf of Topaz or the others, when they ran short of funds. He viewed the money received from Plaintiff not as a loan, but as a capital contribution to VMG. As of trial time, neither VMG nor EISIG had any assets.

Even if Plaintiff understood the general types of documents he was signing, if his consent was induced by fraud, the resulting contracts are voidable. (See 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 297, p. 324.) Defendants did not call Plaintiff's attention to the known fact of serious financial problems with the project, nor to similar facts about the relationship or status of the companies that provided the stock for the supposed security for the note, or about any other companies they owned. Plaintiff was not placed on notice that any of the documents it signed were other than routine loan instruments with valuable collateral, as represented. (See *Brown v. FSR*

14

*Brokerage, Inc.* (1998) 62 Cal.App.4th 766, 777-778 [person signing an instrument may not, in the absence of fraud, coercion or excusable neglect, avoid its terms on the ground of failure to read before signing].) Plaintiff submitted substantial evidence that Defendants failed to disclose specific information about the financial condition of the participants that would have been material to a reasonable business person who was considering whether to enter into these agreements. (*Wilke v. Coinway, Inc., supra,* 257 Cal.App.2d 126, 137-139.)

By citing only to their preferred evidence, Defendants would have us disregard the remaining evidence and reasonable inferences that they intentionally defrauded Plaintiff by soliciting and accepting Plaintiff's money for payments toward project entitlements, when the entities responsible for pursuing the project were relatively low on assets and unable to realistically proceed. Although Dunbar relied in part upon the referral to Gonzales that he received from his Jaynes colleague, he did so because he believed Gonzales had a reputation as a straight shooter in pursuing construction projects, and such projects normally include expenditures toward necessary project entitlements. However, the project was going nowhere, contrary to Gonzales's express and implied representations. The record as a whole demonstrates that because of the materially incomplete information conveyed on this subject, this transaction left plaintiff " 'in a worse position than he otherwise would have been.' " (*Costello v. Roer, supra*, 77 Cal.App.2d 174, 179.)

## C. Title Holder to Property

### 1. *Ruling*

The trial court's decision stated that Dunbar, on behalf of Plaintiff, had credibly testified that Gonzales never informed him that the real property on which the project was proposed was not owned by either VMG or EISIG, but by Topaz. Defendants failed to disclose the nature and extent of Topaz's involvement in the project, as well as its financial condition. Indeed, the court stated that Gonzales's testimony that all material information about the project had been disclosed was not entirely credible.

### 2. *Contentions, Evidence and Analysis*

According to Defendants' view of the evidence, any representations they made about the actual or apparent ownership of the project property were not material, and any damage to Plaintiff was due to its own failure to investigate the deal. Gonzales testified that he tried to be transparent about the participation of Topaz, the property owner, in the deal, but maybe Dunbar did not understand his terminology concerning the HUD loan guarantee process.

Dunbar testified that at the meeting, he got the impression from Gonzales that he was the owner of the land and the project, that he needed "just a few dollars" to finalize some permitting and loan fees, and that Plaintiff's contribution of money would enable him to proceed with the project very soon, within a period of one to six months (as shown by the due date of the two notes). Dunbar testified that he did not learn until depositions were taken in this action that Topaz was the owner of the property, and that Topaz was behind on its loans. Dunbar testified that if he had been told that Topaz was behind on

16

the mortgage, he would have laughed in Gonzales's face and not paid VMG or EISIG any money.

"The essential element of causation is lacking unless the plaintiff sets forth facts to show that his or her actual reliance on the representations was justifiable, so that the cause of the damage was the defendant's wrong and not the plaintiff's fault." (5 Witkin, Cal. Procedure, *supra*, § 732, p. 153, citing *Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 739; *Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 640.) Here, the evidence suggested, and the judge believed, that Plaintiff's participation in the transactions was based on the reasonable understanding that the entities in the notes and pledge agreements owned the property and could provide valuable security for the business loans Plaintiff thought it was making. This understanding was sufficiently shown to be reached through the dissembling and deceptive way in which the deal about the property was pitched. (*Wells v. Zenz, supra*, 83 Cal.App. 137, 140.) Ownership of the property asset was a material fact in the context of these dealings, and substantial evidence supports the trial court's conclusion that Defendants' failure to disclose it justified rescission of the instruments.

### D. Use of Proceeds of Investment

### *1. Ruling*

The trial court's decision interpreted a handwritten accounting provided by Gonzales as showing that the $250,000 paid by Plaintiff was used to reduce the outstanding amounts that third parties were claiming against the Defendant entities, as well as Topaz. Specifically, $130,000 was paid to the project lender, and smaller

17

amounts were paid to reduce bills by the project's lawyers, architects, engineers and other professionals. $30,000 went to Gonzales to "reimburse" him for his expenses, and Gonzales's business associate Peterson received about $17,000 for his expenses.

Based on that state of the evidence, the court concluded that Plaintiff was misled concerning the proposed use of the funds it would be providing. The funds were not used for the promised purpose, to obtain entitlements for the project and/or to secure the HUD loan guarantee. Plaintiff was not told that the funds were to be used to pay down pre-existing debts or to reimburse Gonzales and his associate for alleged project expenses.

## 2. *Contentions, Evidence and Analysis*

Dunbar testified that Plaintiff never anticipated that it would be obtaining an ownership interest in the project, and instead Plaintiff was characterizing the money it was advancing as "loans" to move a reasonably well-developed project along, by obtaining required permits and entitlements. Gonzales's distribution of the money, for purposes other than obtaining such required permits and entitlements (according to his extremely broad and unreasonable definitions of what constituted "moving the project along"), provides evidence in support of the court's conclusion that the alter ego doctrine's requirements were satisfied: " '(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.' " (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300 (*Mesler*).)

18

Although Defendants do not specifically challenge the trial court's ruling that Gonzales is the alter ego of the two entity defendants, the evidence about the eventual disposition of Plaintiff's funds also supports the finding that Plaintiff was materially misled about the actual purpose of the transactions. The use of the money showed there was no separate existence of the corporate entities, and it can be inferred that Plaintiff's decisionmaking about entering into the agreements would have been materially affected if the true purpose had been disclosed. (*Mesler, supra,* 39 Cal.3d at p. 300.) The trial court's resolutions of these factual and legal questions are supported by substantial evidence.

Overall, the grant of rescission for fraud is supported by substantial evidence that the project was not moving forward, as represented, at the time the funds were solicited, and the funds were not used in the manner represented. For all of the reasons stated above, the judgment is affirmed.

## DISPOSITION

The judgment is affirmed. Costs are awarded to Respondent.

HUFFMAN, Acting P. J.

WE CONCUR:


HALLER, J.


AARON, J.

19