Filed 3/13/13  Yancey v. Antoniadis CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| WILLIAM YANCEY, | D060303 |
| Cross-complainant and Appellant, | |
| v. | (Super. Ct. No. 37-2009-00101694-CU-BC-CTL) |
| ROBERT ANTONIADIS et al. | |
| Cross-defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joan M. Lewis, Judge.  Affirmed.

I.

INTRODUCTION

This case concerns a dispute over a real estate transaction.  William Yancey and Donald Spanninga[1] entered into a contract for the sale of Yancey's house to Spanninga. Robert Antoniadis, a real estate broker, acted as a dual agent in the deal.  Yancey

---

[1]    Spanninga is not a party to this appeal.

attempted to cancel the transaction before it was completed, and Spanninga sued Yancey for specific performance of the purchase agreement. Yancey then counter-sued Spanninga and added Antoniadis as a defendant on the cross-complaint, claiming that Antoniadis exerted undue influence on Yancey to persuade Yancey to agree to the deal, and that Antoniadis had breached a number of fiduciary duties that he owed to Yancey. After a bench trial, the trial court found in favor of Spanninga and Antoniadis, and against Yancey.

On appeal, Yancey contends that the trial court applied the wrong legal standards in addressing the issue of undue influence. Yancey further contends that the trial court compounded its error with respect to the issue of undue influence by failing to consider whether there was evidence that Antoniadis either breached Yancey's confidence or engaged in overpersuasion.

Finally, Yancey argues that the trial court erred with respect to Yancey's claim that Antoniadis failed to meet the standard of care and failed to fulfill his fiduciary duties. Yancey contends that the court erred in relying solely on Yancey's signature on preprinted form disclosure documents to conclude that Antoniadis had satisfied his duty to obtain Yancey's informed consent to the dual agency. Yancey further argues that the trial court erred in concluding that Antoniadis did not breach his fiduciary duties to Yancey. According to Yancey, the record belies the trial court's finding that no evidence supports the experts' opinions that Antoniadis breached the standard of care by telling Spanninga the amount that another potential purchaser had offered and that Yancey was willing to accept.

2

We reject Yancey's claims on appeal, and affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

Yancey is a retired physician who was 87 years old in late 2009.  At that time, Yancey lived independently and managed his own affairs, including his financial affairs.  Antoniadis is a real estate broker who listed Yancey's home in the La Playa area of Point Loma in San Diego.  Yancey was generally estranged from his children.

Antoniadis specializes in the La Playa area of Point Loma.  Antoniadis met Yancey in 2006, when Antoniadis was walking door to door, providing homeowners with materials related to his real estate business.  Yancey and Antoniadis became acquaintances and would occasionally have lunch together.

Spanninga is a retired businessman who was looking for a new home in the Point Loma area in 2009.

1.    *The July 2009 listing*

Yancey decided to list his house for sale in July 2009 to test out the market.  He agreed to allow Antoniadis be his listing agent.  Antoniadis listed the house for $1.25 million.  Yancey indicated that one reason he wanted to sell his home was that he was not happy with his family situation in San Diego, and he wanted to spend more time in Louisiana, where he had family members with whom he had better relationships.  In addition, Yancey was concerned that he was having increasing difficulty getting around, and was also worried that the real estate market might be declining.

Antoniadis provided Yancey with a listing agreement, which included real estate agency relationship disclosures. Antoniadis circled the word "Both" on the disclosure form in the statement heading "Agent Representing Both Seller and Buyer." Yancey signed both the listing agreement and the agency disclosure statement.

After signing these documents, Yancey spoke with his daughter-in-law, who is also a realtor in the area. She mentioned to Yancey that if a full-price offer were made on the house, Yancey could be required to pay Antoniadis a commission, even if Yancey declined to accept the offer. Antoniadis allowed Yancey to amend the listing agreement by handwriting on the document, "If Bill Yancey owner & seller is not satisfied with offer he can cancel & reject all offers with no recourse to him." Yancey also wrote on the agency disclosure statement, "Without sale of property, agent will be due no commission or money fees."

Antoniadis marketed the property, but no offers were received at the $1.25 million asking price. Spanninga viewed the property and made a verbal offer of $1.1 million, which Antoniadis relayed to Yancey. Yancey told Antoniadis that he wanted to discuss the offer with his accountant. Yancey ultimately decided not to accept Spanninga's July 2009 offer, and the listing expired.

2.    *The September 2009 listing*

In late September 2009, Yancey's long-time friend, Annie Watson, flew to San Diego to help him clean his house and organize his paperwork. According to Watson, when she arrived on September 25, 2009, Yancey told her that he intended to list the house for sale with Antoniadis.

4

Yancey agreed to pay for the home inspection report, and Antoniadis agreed to relist the property. Yancey signed a new listing agreement. The listing agreement provided that Yancey would pay Antoniadis a five percent commission fee, unless Antoniadis also represented the buyer, in which case the commission fee would be four percent. Antoniadis also presented Yancey with an agency disclosure document, which explained that Antoniadis could represent both the seller and the buyer in a sale transaction—a possibility that was clearly contemplated by the commission fee structure identified in the listing agreement.

After ordering the inspection report, Antoniadis listed the property for $999,500 on the MLS and began to market the property. He scheduled five open houses during a two-week period. Yancey remembered discussing the listing price with Antoniadis, and understood that the purpose of setting the price at just under $1 million was to try to get buyers to bid up the price.

Shortly after the property was listed, Yancey asked Watson to invite Yancey's children to come to the house to identify furniture and personal belongings that they wanted to take when Yancey moved or died. When his children came to the house, Yancey told them that he had listed the property for sale.

3.  *The October events*

Antoniadis held the first open house at Yancey's home on Saturday, October 3, 2009. Erik Mellby, an independent real estate broker and real estate investor, attended the open house. Mellby regarded the property as a "fixer-upper with a view," and determined that he was willing to offer $1.1 million for the home. Mellby's offer was an

all-cash offer for $1.1 million. He sought a 10-day closing period with a 45-day post-closing occupancy period.[2] Mellby set his offer to expire at 5:00 p.m. the following day, October 4.

Antoniadis called Yancey that day and informed him of Mellby's offer. In addition, Antoniadis left a copy of the written offer in Yancey's kitchen for Yancey to review. According to Watson, Yancey said that he had been hoping to receive more for the property and he was concerned about the quick turnaround time in which he would have to move, since he had not yet found another place to live.

Antoniadis held a second open house the following day, Sunday. That morning, Yancey told Antoniadis that he was still undecided about whether to accept Mellby's offer, and said that he was going to consult with some friends that day to discuss the offer. Before Yancey left that morning, he, Watson, and Antoniadis reviewed the Mellby offer and discussed the inspection report, which Yancey had seen the night before. Antoniadis also reviewed the "Confirmation of Real Estate Agency Relationships" submitted with the Mellby offer, and Yancey signed that document.

After reviewing Mellby's offer with Watson and Antoniadis, Yancey and Watson left to meet Yancey's friend, Craig Witt, and a few other people to spend the day on Witt's boat. When Watson and Yancey met up with Witt and his other friends, Yancey discussed the fact that he had listed his house for sale and that there was a pending offer.

---

[2]    Mellby originally intended to offer a 30-day post-closing occupancy period, but after speaking with Watson and Yancey, and seeing the state of Yancey's affairs, he consented to providing a longer post-closing period. Mellby believed that this longer period would be more enticing to the seller.

Witt and Watson both told Yancey that they believed he would be better off living somewhere else, and said that they were excited about the pending offer. At one point, Yancey, Witt, and another man, Witt's friend, left the boat and went to a coffee shop. Watson stayed on the boat. Yancey and the two other men discussed the offer. The other men told Yancey that they thought he should sell the property.

At around 10:00 that morning, at the open house, Gilman Bishop, a real estate broker who was representing his mother, told Antoniadis that he wanted to make an offer on Yancey's house.

At just after 1:00 p.m., Yancey called Antoniadis and requested that he come to Mission Bay to meet with Yancey and Witt to discuss the Mellby offer. Antoniadis left the open house and went to meet Yancey. Antoniadis was with Yancey for approximately 20 minutes, during which they discussed the comparable sales data and whether Yancey should accept the offer. At the end of the discussion, Yancey told Antoniadis that he wanted to " 'sell it.' "

The written offer from Mellby was still at Yancey's house, so Antoniadis left to retrieve it. During his drive to Yancey's home, Antoniadis called Spanninga to tell him that an offer had been made on Yancey's home, that Yancey planned to accept the offer, and that if Spanninga was still interested in the property, he should make an offer. Spanninga told Antoniadis that he was willing to offer $1.060 million. Antoniadis "said

7

something to the effect, 'You have to go back to your old offer at 1-1.' "[3] Spanninga agreed to offer $1.1 million for Yancey's house.

At 2:00 p.m., Antoniadis called Watson to tell her (presumably so that she would tell Yancey) that there was another offer on the property. Eleven minutes later, Antoniadis called Mellby to advise him that another offer was being made on the property. Antoniadis suggested that Mellby increase his offer, but Mellby was unwilling to do so.

At the time Antoniadis picked up the completed Mellby offer from Yancey's house, he also retrieved a blank offer form. Antoniadis then met Spanninga at Spanninga's Mission Beach condominium. Spanninga instructed Antoniadis to prepare a written offer in the amount of $1.1 million. Although Spanninga did not request the specific 10-day escrow or a 5:00 p.m. same-day expiration deadline, Antoniadis wrote the offer so that it would be identical to the Mellby offer. Spanninga signed the offer that day.

After meeting with Spanninga, Antoniadis drove to Witt's boat. Antoniadis and Yancey sat down at a table in the kitchen area of the boat, and Yancey signed paperwork. Yancey admits that he signed the documents, but claims that he did not read all of them. Antoniadis assisted Yancey with the paperwork. He explained to Yancey that the

---

3     Antoniadis's testimony at trial concerning what he said to Spanninga was as follows: "I said he has to make an offer, he has to get in the game now, because Dr. Yancey is accepting another offer. And it has to be at least at 1.1, after he said—he said initially that he wanted to offer a million 60, at which point I interrupted and said it has to be 1.1." During his deposition, Antoniadis also said that he "believe[d]" he told Spanninga that "the price was $1.1 million."

8

Spanninga offer would net Yancey $11,000 more because Antoniadis was also representing Spanninga in the transaction, and that pursuant to the dual agency provision of the contract, the commission fee would be four percent, instead of five. Antoniadis testified that he went over every page of the purchase agreement with Yancey. They discussed the 10-day escrow period, the 45 days that Yancey would have to vacate the property, and the fact that Yancey would receive the funds from the proceeds of the sale prior to having to move out of the house. Antoniadis also told Yancey that he knew that this buyer was "real, he's no nonsense, he'll close."

Yancey signed the Spanninga offer papers at around 3:00 p.m. This included both a "Disclosure Regarding Real Estate Agency Relationship" that reflected that the agent would be representing "both" the buyer and seller, as well as a "Confirmation of Real Estate Agency Relationships," which specifically stated that Antoniadis was representing both parties.

Later that evening, between approximately 5:00 and 6:30 p.m., Antoniadis received an e-mail communication from Bishop. Bishop said that his mother wanted to make an all-cash offer of $1.15 million. Antoniadis did not tell Yancey about the Bishop offer.

A few days later, on October 7, 2009, Yancey went to a Chicago Title Company (Chicago Title) office where he met with Lori Mahoney, an escrow officer, and Antoniadis. While there, Yancey signed the grant deed necessary to transfer title to the property to Spanninga. Mahoney testified that she reviewed the grant deed with Yancey, and provided a general explanation to the effect that the purpose of the deed was to

9

transfer ownership of the property to the buyer. Yancey did not indicate that he did not understand the purpose of the deed, nor did he request time to review the deed or to take it home with him. Yancey did not indicate in any way to Mahoney that he did not wish to sell his home or that he was concerned or confused.

Mahoney reviewed a number of documents with Yancey during their meeting and explained the documents to him. At times, Mahoney would ask Yancey questions, to which he would provide answers. Yancey gave Mahoney detailed information about himself, including his date of birth, birthplace, social security number, his occupation, and marital status. Yancey confirmed that title to the property was held in the name of the trust, and provided the date of the trust's inception, told her that the trust was revocable, and said that he had authority to act under the trust. Yancey also told Mahoney that his "financial broker," John Cartmill, would be contacting the Chicago Title office prior to the closing of escrow to inform them where to send the proceeds from the sale of the property. Mahoney testified that she and Yancey discussed the fact that Yancey was looking for a new place to live, and said that they talked about the possibility that Yancey could rent Mahoney's mother's home in Chula Vista.

In the week after Yancey agreed to accept Spanninga's offer, Spanninga conducted an inspection of the property. Yancey walked through the house with Spanninga and explained different features of the house, detailing the history of work that had been done on the house. Yancey also provided Spanninga with a large set of architectural building plans for the house. During this time, Yancey told Spanninga that he wanted to spend more time in Louisiana, and said that he might move into a condominium at Le Rondelet,

10

a retirement community in La Jolla. Yancey also discussed the tax consequences of the sale, and told Spanninga that he did not want his relatives involved in his personal business.

Yancey discussed where he would move with a number of people, including Watson. He said that he might move to Louisiana, and that he had contemplated doing so for many years. Watson and Yancey toured a unit at Le Rondelet, and Watson found information online concerning a unit at a complex called "The Gables."

Yancey also discussed his relocation with Cartmill. Yancey told Cartmill that he had sold his home. At Yancey's request, Cartmill took Yancey to look at an apartment.

On October 8, 2009, Yancey signed a lease agreement for a unit at Le Rondelet. Yancey wrote out a check for the lease that day. However, he later changed his mind and called the broker to cancel the transaction.

After Yancey signed the agreement to sell his house, Spanninga opened escrow by depositing $100,000 with Chicago Title.

On October 12, 2009, eight days after signing the agreement and five days after executing the grant deed and the other escrow documents, Yancey went to the Chicago Title office and demanded the return of the grant deed. Yancey said that he wanted to cancel the pending escrow.

B.    *Procedural background*

Spanninga filed a complaint against Yancey, alleging breach of contract and intentional interference with contractual relations, and seeking specific performance of

11

the contract. Yancey answered the complaint, and raised affirmative defenses, including lack of mental capacity and undue influence.

Yancey concurrently filed a cross-complaint against Spanninga, and added Antoniadis and RACA, Inc., dba Robert Realty, as cross-defendants.[4] In the cross-complaint, Yancey alleged causes of action for elder abuse, breach of fiduciary duty, constructive fraud, negligence, rescission, declaratory relief, "tort of another," and unfair business practices.

The case proceeded to a bench trial. The court heard evidence and argument for eight days. After the parties submitted proposed statements of decision to the trial court, the court ultimately issued its own tentative statement of decision on April 18, 2011. The court found in favor of Spanninga and Antoniadis, and against Yancey, on both Spanninga's complaint and Yancey's cross-complaint. Yancey objected to the proposed statement of decision. The trial court adopted its tentative statement of decision as its final statement of decision, and entered judgment in favor of Antoniadis and Spanninga and against Yancey.

---

4      We will refer to cross-defendants Antoniadis and RACA, Inc., dba Robert Realty, as "Antoniadis."

12

III.

DISCUSSION

A.  *The trial court did not err in determining that Yancey was not unduly influenced to enter into the purchase contract for his home*

The Civil Code defines undue influence as: 1) "the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him"; 2) "taking an unfair advantage of another's weakness of mind"; or 3) "taking a grossly oppressive and unfair advantage of another's necessities or distress."  (Civ. Code, § 1575.)

Yancey claims that at trial, he asserted that all three of the factors identified in Civil Code section 1575 were present in this case, but that the trial court considered only *one* of the three factors in deciding whether undue influence existed here—i.e. whether Antoniadis took advantage of Yancey's weakness of mind.  Yancey further contends that in considering this single factor, the trial court "placed the erroneously high burden on Yancey to prove that his 'weakness of mind' amounted to *a total incapacity to contract*."  He argues that because the other two elements that could amount to undue influence under Civil Code section 1575 "do not require proof of any weakness of mind," the trial court erred in focusing on the evidence of weakness of mind, and therefore, "failed to consider whether Yancey's mental weakness, Antoniadis'[s] overpersuasion, and breaches of confidence *in combination* overbore Yancey's will and improperly induced him to execute the purchase agreement with Spanninga . . . ."

13

"Undue influence . . . is a shorthand legal phrase used to describe persuasion which tends to be coercive in nature, persuasion which overcomes the will without convincing the judgment. [Citation.] *The hallmark of such persuasion is high pressure, a pressure which works on mental, moral, or emotional weakness to such an extent that it approaches the boundaries of coercion.* In this sense, undue influence has been called overpersuasion. [Citation.] Misrepresentations of law or fact are not essential to the charge, for a person's will may be overborne without misrepresentation." (*Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 130 (*Odorizzi*), italics added.)

"In essence undue influence involves the use of excessive pressure to persuade one vulnerable to such pressure, pressure applied by a dominant subject to a servient object. In combination, the elements of undue susceptibility in the servient person and excessive pressure by the dominating person make the latter's influence undue, for it results in the apparent will of the servient person being in fact the will of the dominant person." (*Odorizzi*, *supra*, 246 Cal.App.2d at p. 131.)

With respect to the first component of undue influence—i.e., undue susceptibility in the subservient person, the *Odorizzi* court explained that this may vary from complete incapacity to mere mental weakness. "Undue susceptibility may consist of total weakness of mind which leaves a person entirely without understanding [citation]; or, a lesser weakness which destroys the capacity of a person to make a contract even though he is not totally incapacitated [citations]; or, the first element in our equation, a still lesser weakness which provides sufficient grounds to rescind a contract for undue influence [citations]. Such lesser weakness need not be longlasting nor wholly incapacitating, but

14

may be merely a lack of full vigor due to age [citation], physical condition [citation], emotional anguish [citation], or a combination of such factors." (*Odorizzi*, *supra*, 246 Cal.App.2d at p. 131.) "In some of its aspects this lesser weakness could perhaps be called weakness of spirit. But whatever name we give it, this first element of undue influence resolves itself into a lessened capacity of the object to make a free contract." (*Ibid.*)

The *Odorizzi* court noted that the second component of undue influence—i.e., excessive pressure by the dominating person—has received less judicial consideration. (*Odorizzi*, *supra*, 246 Cal.App.2d at p. 132.) According to the *Odorizzi* court, "there are few cases denying persons who persuade but do not misrepresent the benefit of their bargain. Yet logically, the same legal consequences should apply to the results of excessive strength as to the results of undue weakness. Whether from weakness on one side, or strength on the other, or a combination of the two, undue influence occurs whenever there results 'that kind of influence or supremacy of one mind over another by which that other is prevented from acting according to his own wish or judgment, and whereby the will of the person is overborne and he is induced to do or forbear to do an act which he would not do, or would do, if left to act freely.' [Citation.]" (*Ibid.*)

Undue influence, therefore, "involves a type of mismatch" that presents an unfair advantage for one party. (*Odorizzi*, *supra*, 246 Cal.App.2d at p. 132.) "Whether a person of subnormal capacities has been subjected to ordinary force or a person of normal capacities subjected to extraordinary force, the match is equally out of balance. If will has been overcome against judgment, consent may be rescinded." (*Ibid.*)

15

In this case, the trial court essentially concluded that there was no unbalance that allowed Yancey's will to be overcome—i.e., there was neither a particular weakness on Yancey's part, nor any extraordinary force used by Antoniadis.

Among the arguments that Yancey makes on appeal is that the trial court incorrectly assumed that in order to establish that he had been the victim of undue influence, Yancey had to prove a total incapacity to contract. However, the record does not bear this out. Although, as Yancey points out, all of the experts agreed that Yancey suffered from some mild cognitive impairment, the mere existence of a cognitive impairment does not "demonstrate[] the requisite weakness of mind as a matter of law" that Yancey claims it does. Rather, a fact finder must weigh the evidence regarding any such cognitive impairment and decide whether the impairment rendered the person susceptible to having his will overcome. The trial court clearly considered the extensive evidence regarding Yancey's cognitive functioning, as well as testimony from Yancey and his friends and family, together with evidence concerning how this transaction transpired, and reached the conclusion Yancey was not particularly susceptible to undue influence at the time of the transaction.

In reaching this conclusion, the trial court relied in particular on the testimony of Dr. Dominick Addario, who considered a number of factors and arrived at the opinion that Yancey had the capacity to freely enter into the contract at hand, absent any particular susceptibility to outside forces, including forces that were alleged to have come from Antoniadis. Specifically, Dr. Addario noted that at the time Yancey executed the documents pertaining to the sale of his home, he (1) was not isolated; (2) was not under

16

anyone's control other than his own; (3) had family, friends and/or advisors available to him; (4) was able to understand new information; (5) did not have a history of bad decision-making; (6) had been living independently and had the ability to care for himself; (7) did not have a history of irrational thinking; (8) did not suffer from a drug or alcohol addiction; and (9) had only mild cognitive impairment.

Yancey challenges Dr. Addario's opinion, arguing that it lacked sufficient substantiation because Dr. Addario never expressed an opinion concerning Yancey's susceptibility under circumstances such as those that existed here. In other words, Yancey contends that Dr. Addario never considered the fact that Yancey consented to the sale of his home to Spanninga under unique time pressures and in an unusual location, in determining whether Yancey was susceptible to undue influence at the time. However, the *trial court* was well aware of the circumstances of the transaction, including the fact that both offers were set to expire at 5:00 p.m. that Sunday evening. The trial court could reasonably rely on Dr. Addario's opinion concerning Yancey's mental state and his susceptibility to undue influence generally, and apply Dr. Addario's opinion to the facts of this case. It appears that this is precisely what the court did in concluding that Yancey "was *not* susceptible to undue influence *at the time of the transaction . . . .*" (Second italics added.) The trial court did not err in relying on Dr. Addario's opinion in applying the factors that Dr. Addario raised to the circumstances of this case for purposes of deciding the issue of undue influence.

Yancey also maintains on appeal that the trial court applied an incorrect standard to his undue influence claim by requiring that he demonstrate a total lack of capacity to

17

contract, such as would be required to invalidate a will, rather than the lesser standard that would undermine an inter vivos land transfer. Yancey contends that because the trial court applied an incorrect standard, the court "never considered whether the circumstances surrounding the transaction suggested Antoniadis took unfair advantage of Yancey's *weakened mental capacity*, short of *total incapacity*," and as a result, never "shift[ed] the burden of proof to Antoniadis to demonstrate how the transaction was otherwise fair to Yancey or in his best interests . . . ."

In its statement of decision, the trial court makes several references to Yancey's "capacity" to contract, and notes that it was Dr. Addario's opinion that "Yancey had the capacity to enter into a contract for the sale of his home and that Yancey was *not* susceptible to undue influence at the time of the transaction . . . ." Yancey's position on appeal that the trial court applied the wrong standards in considering the issue of undue influence in this case is apparently based on the court's references to Yancey's "capacity" to contract. However, in considering the statement of decision as a whole, it is clear that the trial court used the term "capacity" to refer to Yancey's capacity *under the circumstances of the transaction in this case,* to determine his susceptibility to Antoniadis's influence and whether Yancey's will was overcome such that he agreed to sell his home when he did not really want to do so. Contrary to Yancey claims, the court did not require that he prove total incapacity to contract in order to succeed on his undue influence claim.

The trial court's statement of facts is replete with facts demonstrating that Yancey's decision to accept Spanninga's offer was not the result of his will being

18

overcome by Antoniadis. For example, the trial court found that in consummating the deal, Yancey relied on the opinions of his close friends, Watson and Witt. The court also found that at significant points over the course of the transaction, Yancey or his friends summoned Antoniadis and requested his help; Antoniadis did not force himself on Yancey. For example, at Yancey's direction, Watson called Antoniadis in late September 2009 to tell him that Yancey wanted to list his house for sale again. Further, on the day that Yancey signed the purchase agreement, it was Yancey who called Antoniadis to ask him to come to Witt's boat to discuss the Mellby offer. In addition, according to the trial court's findings of fact, Yancey did not make any of the decisions about listing his house for sale or selling it alone, with only Antoniadis's input. Rather, he consulted with his trusted friends at every turn, and asked for their input and advice as to what he should do. His friends counseled him to accept the offer.

Beyond this, in concluding that Yancey freely entered into the contract and had not been subjected to undue influence, the trial court also considered the manner in which Yancey conducted himself in the days after he accepted Spanninga's offer. For example, the trial court found that several days after signing the purchase agreement, Yancey went to the escrow office and signed all of the papers without objection. He did not request the opportunity to take the deed home for review, nor did he indicate in any way that he did not want to go through with the deal. He readily provided information to the escrow officer and never expressed any concern about the transaction. The trial court concluded that "the evidence demonstrates that Yancey made no indication to [the escrow officer]

19

that he did not wish to sell his home and . . . provided no other indication of any form that something was awry."

The trial court further found that Yancey discussed his relocation with his financial advisor, and asked the advisor to accompany him to look at an apartment. Yancey later entered into a lease agreement for an apartment. Yancey even guided Spanninga on a tour of Yancey's house, offering information about the home's history and features, and gave Spanninga the architectural drawings for the house. The trial court would not have had to make all of these findings of facts concerning Yancey's conduct after he signed the purchase agreement if the court was simply considering whether Yancey had the capacity to contract, in general, and was not considering whether he was subjected to undue influence under the particular circumstances of the transaction.

The record does not support Yancey's suggestion that the trial court required that he prove that he had a total incapacity to contract. Although the trial court's statement of decision could have been more clear on the subject of undue influence, it is apparent from a reading of the entire statement of decision that the trial court concluded that Yancey was not particularly susceptible to any undue influence at the time he entered into the transaction in this case, despite the fact that he suffered from "some cognitive impairment."

With respect to Yancey's contention that the trial court erred in failing to "shift the burden of proof to Antoniadis to demonstrate how the transaction was otherwise fair to Yancey or in his best interests," a party must demonstrate more than a mentally weakened condition before a presumption of undue influence arises, such that the burden shifts to

20

the other party to prove the "fairness" of a transaction.  As the court in *O'Neil v. Spillane* (1975) 45 Cal.App.3d 147 (*O'Neil*) made clear, the party claiming undue influence must demonstrate a weakened mental state *and also* present evidence of other circumstances that suggest coercion:  "[W]ith respect to gifts or conveyances inter vivos the susceptibility to imposition, the extreme age and infirmity, of the grantor, *together with slight evidence of circumstances from which it may be inferred that the instrument was the product of coercion*, will suffice to shift the burden and require the beneficiary to show affirmatively that the transaction was fair and free from influence [citations.]"  (*Id.* at p. 155, italics added.)

In *O'Neil*, the evidence demonstrated that "respondent was susceptible to imposition on account of her age and mental infirmity *and the evidence of record gave rise to an inference that the transaction complained of was not the product of respondent's free volition.*"  (*O'Neil*, *supra*, 45 Cal.App.3d at p. 155, italics added.) Given circumstances that suggested that O'Neil's will had been overcome and that she had not entered into the transaction freely, the *O'Neil* court determined that "the burden of proof shifted to appellants, and [it became] incumbent upon them to overcome the presumption of undue influence."  (*Ibid.*)  In this case, the record demonstrates that the trial court considered whether the circumstances surrounding the transaction suggested that Antoniadis somehow took unfair advantage of Yancey's weakened state, and concluded that the evidence did not suggest that Yancey's will had been overcome.

21

Having reached this conclusion, the trial court was not required to shift the burden to Antoniadis to demonstrate that the transaction was "fair" to Yancey.[5]

Given the trial court's finding that Yancey was not particularly susceptible to undue influence, even with a mild cognitive impairment, and given the circumstances of the transaction as found by the court, the trial court simply did not agree with Yancey that Antoniadis undertook any action that overcame Yancey's will. There was no error of law in the trial court's resolution of this issue.

---

[5] At oral argument, Yancey's counsel suggested that there was evidence from which the trial court could have concluded that the deal was "not fair" to Yancey, such that the trial court might have determined that Antoniadis had not met his burden to demonstrate that the deal was fair and free of undue influence. The two items of evidence to which Yancey's attorney pointed to suggest that the deal was not fair to Yancey are that (1) the Bishop offer, which was for an amount greater than either the Mellby offer or the Spanninga offer, was never disclosed to Yancey, and (2) unlike the Mellby offer, the Spanninga offer was not an "as-is" offer. At oral argument, the attorneys disagreed as to whether Spanninga's offer was or was not an "as-is" offer. The trial court found that the Spanninga offer was written to exactly mirror the terms of the Mellby offer. In his briefing on appeal, Yancey did not mention any evidence concerning whether either offer was or was not "as is." In addition, Yancey did not raise Antoniadis's failure to disclose the terms of the later-submitted Bishop offer in support of his claim that the trial court might have determined that Antoniadis failed to satisfy his burden to demonstrate that the transaction was fair to Yancey. These evidentiary issues are of no consequence, however, since we conclude that the trial court did not err in its analysis of the undue influence question.

B.	*The trial court's findings of fact demonstrate that the court rejected Yancey's contentions that he was unduly influenced as a result of breaches of confidence or overpersuasion*

Yancey contends that all of the hallmarks of overpersuasion identified in *Odorizzi* were present here, and that the trial court ignored these factors. In defining the term "overpersuasion," the *Odorizzi* court explained:

> "[O]verpersuasion is generally accompanied by certain characteristics which tend to create a pattern. The pattern usually involves several of the following elements: (1) discussion of the transaction at an unusual or inappropriate time, (2) consummation of the transaction in an unusual place, (3) insistent demand that the business be finished at once, (4) extreme emphasis on untoward consequences of delay, (5) the use of multiple persuaders by the dominant side against a single servient party, (6) absence of third-party advisers to the servient party, (7) statements that there is no time to consult financial advisers or attorneys. If a number of these elements are simultaneously present, the persuasion may be characterized as excessive." (*Odorizzi*, *supra*, 246 Cal.App.2d at p. 133.)

We disagree with Yancey's contention that the trial court ignored these factors. Rather, the court's recitation of facts establishes that the trial court simply determined that these factors were not present in this case. The evidence supports this determination.

In arguing that the evidence *does* establish that he was subject to overpersuasion within the meaning of *Odorizzi*, Yancey contends that the transaction in this case occurred at an unusual or inappropriate time and/or place. We disagree. As the trial court found, the circumstances that led to this transaction occurred over a two-day period, and the final signing occurred during the daytime, at a location where Yancey had chosen to socialize with friends. Specifically, Antoniadis informed Yancey of Spanninga's offer while Yancey was sitting on his friend's boat. Although perhaps "unusual" in the sense

23

that many people may not have access to a boat, the location was not unusual in terms of being a place where Yancey would feel out of his element or unsure of himself. In addition, Yancey was the one who called Antoniadis to come out to Witt's boat. Thus, the location was of Yancey's choosing, not Antoniadis's. Further, although this occurred on a Sunday afternoon, this was not unusual given the fact that Antoniadis was holding an open house at Yancey's home that day. One who is attempting to sell his or her home could not reasonably think that it was unusual to receive an offer for the purchase of the home on a day on which potential buyers are encouraged to visit the property.

Similarly, the trial court's recitation of its factual findings supports the conclusion that there was simply no "demand that the business be finished at once," the third *Odorizzi* factor. (*Odorizzi*, *supra*, 246 Cal.App.2d at p. 133.) In fact, there is no evidence that Antoniadis ever said or otherwise conveyed anything of the sort to Yancey. On appeal, Yancey focuses on the time constraints contained in the offer, rather than on any specific "demand that the business be finished at once." (*Ibid*.) However, the trial court's findings demonstrate that this transaction was the culmination of a somewhat lengthy process that occurred over a period of time. Yancey thought about listing his house for sale months prior to this transaction. Although he changed his mind and decided not to sell in June, he clearly had been considering selling his house for months prior to executing the documents in this case. Further, although the final deal was completed on an expedited schedule, the compressed schedule was not attributable to Antoniadis. Rather, the quick turn-around resulted from Mellby's decision to make his offer expire at 5:00 p.m. on that Sunday, October 4. Antoniadis simply mirrored those

24

terms in drafting Spanninga's offer. However, this fact does not mean Yancey was pressured to accept the terms of either of those offers. There was no evidence that anyone other than Yancey's own friends urged him to complete any deal that day. The court's recitation of the facts of this case also demonstrates that the court did not find any evidence that Antoniadis pressured Yancey to accept Spanninga's offer or placed "extreme emphasis on untoward consequences of delay." (*Ibid.*) There is no evidence to suggest that Antoniadis told Yancey that if he did not accept Spanninga's offer, something negative would occur.

Yancey also contends that the trial court ignored the fact that there were "other persuaders, such as Watson and Witt" whom Antoniadis used "to manipulate Yancey into executing the Purchase Agreement in a prompt and unorthodox fashion." The trial court's findings do not support Yancey's version of events. Rather, both Watson and Witt were described as being *Yancey's* friends. In fact, according to the court, Watson was Yancey's "long-time friend," a friend who had never met or spoken with Antoniadis until September 29, when she called Antoniadis at *Yancey's* request. The fact that Yancey's own friends and confidants were in favor of Yancey selling his house does not mean that these people were Antoniadis's confederates, or can be viewed as being part of the "dominant side" of this transaction (if any such "dominant" side could even be claimed to exist). Rather, their apparent agreement that Yancey should sell his house is simply more evidence that the decision to sell was reasonable. These people had no apparent incentive to assist Antoniadis. If anything, it appears that their motivation would have been to advise Yancey as to what they believed would be in Yancey's best interests.

25

Finally, Yancey asserts that the trial court ignored the evidence of the "absence of uninterested, third party advisors."  Again, the trial court found that Yancey had his friends available to act as his advisors and provide their opinions on the matter.  These people cannot reasonably be seen as having any personal interest in the deal or any relationship with Antoniadis that would have given them an incentive to pressure Yancey to do what Antoniadis wanted him to do.  Instead, they were clearly uninterested advisors.  Further, there is no evidence that Yancey was discouraged from seeking additional input from a financial or tax advisor prior to deciding to list his house for sale, or prior to accepting Spanninga's offer.

In sum, the trial court did not ignore evidence of "overpersuasion," as Yancey suggests.  Rather, the trial court considered the facts surrounding this transaction and ultimately concluded that the circumstances did not establish overpersuasion of Yancey by Antoniadis.

C.    *The trial court did not err in concluding that Antoniadis met the standard of care pertaining to informed consent for dual agency*

Yancey contends that the trial court erred in "summarily deciding that because Yancey signed pre-printed disclosures concerning Antoniadis acting as a dual agent for both Yancey and Spanninga, Antoniadis had acted within the standard of care and did not breach any fiduciary duties owed to Yancey."[6]

---

6      The trial court did not rely solely on Yancey's signing the disclosure forms to conclude that Antoniadis had acted within the standard of care with respect to *all* of the potential standard of care issues that Yancey had raised.  Rather, the court addressed all

26

Yancey argues that when a fiduciary relationship exists, the fiduciary has a duty to "make full and complete disclosures of all material facts within his knowledge relating to the transaction in question." Yancey contends, in essence, that Antoniadis had a duty to provide Yancey with additional information, beyond the disclosure forms, regarding "all potentially adverse ramifications that may result" (italics omitted) from Antoniadis acting as a dual agent, and thereby not giving his undivided loyalty to Yancey. We conclude that the trial court appropriately determined that Antoniadis satisfied his duty to disclose the dual agency and to obtain Yancey's consent to that dual agency.

In the context of an agreement to sell real property on another's behalf, "[a] real estate agent must refrain from dual representation in a sale transaction unless he or she obtains the consent of both principals after full disclosure." (*Sierra Pacific Industries v. Carter* (1980) 104 Cal.App.3d 579, 581-582.) "In the context of residential real estate transactions, such disclosure must be in writing. [Citations.]" (*L. Byron Culver & Associates v. Jaoudi Industrial & Trading Corp.* (1991) 1 Cal.App.4th 300, 305, fn. 3.) This is because "[c]ommon sense and ancient wisdom join the law in teaching that an agent is not permitted to simultaneously serve two principals whose interests conflict about the matter served—at least, not without full disclosure and consent from both." (*Brown v. FSR Brokerage, Inc.* (1998) 62 Cal.App.4th 766, 769 (*Brown*).) The requirement of disclosure and consent in brokered real estate transactions has been codified in Civil Code sections 2079.14, 2079.16, and 2078.17.

---

of Yancey's claims in which Yancey alleged that Antoniadis's various actions amounted to breaches of the standard of care, and disposed of each claim independently.

27

As the trial court found, Antoniadis complied with the Civil Code requirements for disclosing the dual agency as soon as possible and for obtaining consent. Antoniadis put Yancey on notice that he intended to act as a dual agent when he had Yancey sign the disclosure form required by Civil Code section 2079.14. On this form, Antoniadis circled the word "Both" in the heading "Agent Representing Both Seller and Buyer." Yancey signed the form on September 30, 2009, acknowledging that he had received it. That form cautioned, "The above duties [i.e., the normal duties owed by an agent to a buyer and a seller] of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests." In addition, Antoniadis informed Yancey, both in the listing agreement and by oral explanation, that Antoniadis's commission fee would be reduced from five percent to four percent if he represented both Yancey and the buyer. Beyond this, Antoniadis provided Yancey with a form, which Yancey also signed, entitled "Disclosure And Consent For Representation Of More Than One Buyer Or Seller." This document specifically states, in bold type, "Seller and/or Buyer acknowledge reading and understanding this Disclosure and Consent for Representation of More than One Buyer or Seller and agree to the dual agency possibility disclosed." Yancey signed this form on September 30, 2009.

Later, when Antoniadis presented Spanninga's offer to Yancey while Yancey was on Witt's boat on October 4, 2009, Antoniadis complied with the provisions of Civil Code section 2079.17.[7] This was "as soon as practicable" because it was the first offer

---

[7] Section 2079.17 of the Civil Code provides:

28

that Yancey had received from a prospective buyer for whom Antoniadis was also acting as an agent. One section of the purchase agreement, which Yancey signed, confirmed that Antoniadis was acting as both the seller's and the buyer's agent. As the trial court pointed out, Antoniadis also provided Yancey with a second agency disclosure form, and had him execute a document entitled "Confirmation of Real Estate Agency Relationships" in which Yancey confirmed his understanding that Antoniadis would be representing both Yancey and the buyer in the transaction.

In addition to these documentary disclosures, the evidence also demonstrated that Antoniadis walked Yancey through the documentation, and explained that Yancey would save $11,000 by accepting Spanninga's offer because Antoniadis was also representing

> "(a) As soon as practicable, the selling agent shall disclose to the buyer and seller whether the selling agent is acting in the real property transaction exclusively as the buyer' s agent, exclusively as the seller's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the selling agent prior to or coincident with execution of that contract by the buyer and the seller, respectively.
>
> "(b) As soon as practicable, the listing agent shall disclose to the seller whether the listing agent is acting in the real property transaction exclusively as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the listing agent prior to or coincident with the execution of that contract by the seller."

That section also provides the form to be used in disclosing this information to the seller and/or buyer. (See Civ. Code, § 2079.17, subd. (c).)

Spanninga. Based on this, the trial court properly determined that Antoniadis met his disclosure obligations regarding the dual agency.

Yancey attempts to expand what is required of a dual agent for purposes of providing proper disclosure and obtaining consent to a dual agency. Yancey asserts that "merely obtaining the client's signature on the agency disclosure forms alone does not satisfy the broker's duty to obtain his client's *informed* consent to dual agency." However, the authority that Yancey cites as support for this contention, *Brown*, *supra*, 62 Cal.App.4th 766, suggests merely that an agent cannot simply obtain a client's signatures on the agency disclosures forms, but must call the client's attention to the existence of the dual agency relationship in order to satisfy the disclosure requirements.

In *Brown*, a case on review after summary judgment had been entered in favor of the defendants (and thus unlike this case, in which a full trial was conducted), the court rejected the defendants' argument that the plaintiff had signed or initialed disclosure documents that adequately disclosed the dual agency, such that he had sufficiently consented to dual agency. (*Brown, supra,* 62 Cal.App.4th at p. 777.) According to the defendants, the plaintiff's claim that he had not consented to the dual agency was due to the fact that he had decided not to read the disclosure documents. The *Brown* court quoted with approval *Bolanos v. Khalatian* (1991) 231 Cal.App.3d 1586, 1590, stating, "It is, of course, true that '[w]hen a person with the capacity of reading and understanding an instrument signs it, he may not, in the absence of fraud, coercion or excusable neglect, avoid its terms on the ground he failed to read it before signing it.' " (*Brown*, *supra*, at p. 777.) However, the *Brown* court went on to say that "the statute and common sense

30

require that the dual agent *call attention to the fact of dual agency*," and concluded that under the facts in that case, the plaintiff had demonstrated that the agents had not actually called his attention to the fact that they were acting as dual agents. (*Id*. at p. 778.) In fact, according to the factual background of the case, it was the plaintiff's position that the defendants had repeatedly told him that they were working for him, *exclusively*. (*Id*. at p. 770.) Thus, the plaintiff in *Brown* "was not on notice that any of the documents he signed or initialed was anything other than a routine instrument technically required for consummation of the sales transaction." (*Id*. at p. 778.)[8]

This case is clearly distinguishable from *Brown.* The facts as found by the trial court meet the standard set forth in *Brown* for the requirements for sufficient disclosure of the dual agency relationship and for obtaining a principal's consent to the dual agency. Unlike in *Brown*, Antoniadis notified Yancey of the possibility of a dual agency relationship when Yancey signed the listing agreement. One of the documents that Yancey signed on September 30, 2009 specifically stated, "Seller and/or Buyer acknowledges reading and understanding this Disclosure and Consent for Representation of More than One Buyer or Seller and agree to the dual agency possibility disclosed." In *Brown*, in contrast, it does not appear that there was a disclosure of the possibility of dual agency at the time of the listing, and there was no written offer or signed purchase

---

[8]     A second reason that the *Brown* court gave for rejecting the defendants' argument that the plaintiff had consented to the dual agency by signing the disclosure forms was that by the time he had signed the dual agency consent forms, he had already been convinced by the person he thought was his exclusive agent to agree to the lower price being offered by the buyer, and had indicated his assent to the lower price, essentially locking him into that price with the buyer. (*Brown, supra,* 62 Cal.App.4th at p. 778.)

31

agreement in that case. (*Brown*, *supra*, 62 Cal.App.4th at p. 772.) The dual agency disclosure forms in *Brown* were not presented to the plaintiff until he was signing the escrow documents, and they were included with a number of documents that the plaintiff signed at that time. (*Ibid.*) The agents did not call attention to the dual agency forms or highlight the dual agency in any manner, but instead, simply included the dual agency forms in a pile of forms that the plaintiff had to sign. (*Ibid.*) Additionally, there was evidence that one of the dual agents specifically told the plaintiff that he was plaintiff's agent, exclusively, contrary to the dual agency. (*Id.* at p. 771.) There is no similar factual allegation in this case. It appears that Antoniadis did precisely what the *Brown* court contemplated he should have done—i.e., he called attention to the possibility of the dual agency early on, and later, when he presented Yancey with Spanninga's offer, he called Yancey's attention to the fact that he would be acting as a dual agent, pointing out that Yancey would be saving money as a result of the dual agency.

Yancey further argues that "informed consent" in the context of dual agency in a real estate transaction means that the fiduciary must disclose not only the existence of the dual agency relationship, but must also disclose to the principal "*all potentially adverse ramifications that may result if [the principal does] not receive [the agent's] undivided loyalty*." Yancey cites to *Jorgensen v. Beach 'N' Bay Realty, Inc.* (1981) 125 Cal.App.3d 155, 160-161 (*Jorgensen*), and *Huijers v. DeMarrais* (1992) 11 Cal.App.4th 676, 686 (*Huijers*), in support of this contention. However, neither of those cases suggests that the trial court erred in this case in concluding that Antoniadis sufficiently disclosed the dual agency.

In *Jorgensen*, the plaintiff appealed from a judgment after a nonsuit was granted in favor of her real estate broker and the agents with whom the plaintiff had worked. (*Jorgensen*, *supra*, 125 Cal.App.3d at p. 157.) The plaintiff had listed a residential property for sale with the agents for $214,500. While the agents were working for the plaintiff, they met the Albins, a couple who were looking for southern California real estate investments. (*Id*. at p. 158.) After showing the plaintiff's house to the Albins, the agents helped the Albins prepare an offer for the house of $200,000. (*Ibid*.) When presented with the offer, the plaintiff told the agents that she wanted another $5,000 out of the deal, but they discouraged her from making a counter-offer and told her that asking for more money would risk her losing the deal because the Albins were going to be leaving town. (*Ibid*.) The plaintiff agreed to the price but asked for a shortened escrow period. The Albins agreed to the shortened escrow. (*Ibid*.) Nine days after they agreed on the terms of the sale, but before escrow had closed, one of the agents obtained an exclusive listing agreement for the residence from the Albins, and listed the proposed sale price as $234,500. (*Ibid*.) As soon as escrow closed, the agents immediately listed the property for the Albins and sold the residence for $227,000. When the plaintiff's husband inquired regarding the sale price, one of the agents obfuscated and said that he could not provide the sale price because it was a "complicated transaction," which, in fact, it was not. (*Ibid*.) During this time and after, the agents handled other real estate transactions for the Albins. (*Ibid*.)

*Jorgensen* did not involve a question as to whether the agents had sufficiently disclosed their dual agency or obtained consent from the plaintiff to a dual agency; the

33

record in that case "conclusively show[ed] [the agents] disclosed their dual agency." (*Jorgensen*, *supra*, 125 Cal.App.3d at p. 159.) Rather, the plaintiff alleged that the agents owed her additional fiduciary duties, separate and apart from the duty to disclose dual agency and obtain consent to dual agency, and that they had breached those duties by failing to disclose "*all* material facts within their knowledge which might have affected [the plaintiff's] decision to accept the purchaser's offer." (*Id.* at p. 160.) The case does not stand for the proposition that an agent cannot sufficiently disclose the existence of a dual agency relationship by providing a seller with the proper statutory forms at the appropriate times and by obtaining the seller's signature on the forms.

Similarly, *Huijers* does not stand for the proposition that Antoniadis had a duty to disclose *more* than what was disclosed in the statutorily-required disclosure forms in order to adequately inform Yancey of the dual agency and obtain his consent to the dual agency. In *Huijers*, there was "no dispute that [the agent] failed to provide the [sellers] with the disclosure form required by [the Civil Code] prior to entering into the listing agreement." (*Huijers*, *supra*, 11 Cal.App.4th at p. 684.) The buyer, who was attempting to preserve the sale transaction, contended that the agent had been in "substantial compliance" with the statutory requirements for disclosure of the potential for dual agency because she had provided the necessary disclosure form "at the time the purchase contract was signed." (*Ibid.*) In concluding that there had not been substantial compliance with the statute, and in determining what the appropriate remedy for the failure to disclose should be, the *Huijers* court made the following statement, which Yancey quotes in his brief: "We read [the Civil Code provision now found in section

34

2079.16] as a legislative determination that the information required to be disclosed alerts the parties to the potentially harmful consequences of dual representation, so they can make an informed judgment." (*Huijers*, *supra*, at p. 686.) In context, this statement supports the notion that an agent who properly uses the statutorily-required forms to disclose a dual agent relationship has satisfied his or her duties regarding the disclosure of, and obtaining consent for, the dual agency. The trial court in this case found that Antoniadis properly used the statutorily-required forms. *Huijers* does not compel reversal for lack of disclosure and consent for dual agency.

In a related contention, Yancey asserts that the trial court erred in concluding that Antoniadis "had acted within the standard of care and did not breach any fiduciary duties owed to Yancey" when the court "failed to consider the unauthorized information Antoniadis conveyed to Spanninga well before making any dual agency disclosures to Yancey." Yancey points out that even if the court correctly concluded that Yancey had given his informed consent to the dual agency when he signed the documents accepting Spanninga's offer, Antoniadis told Spanninga the specific amount that Mellby had offered *before* Yancey had agreed to the dual agency. Our review of the record supports the trial court's factual finding on this issue.

The trial court concluded that Antoniadis did not breach the standard of care that he owed to Yancey, finding that Antoniadis did not disclose to Spanninga the amount of the Mellby offer. In making this finding, the court acknowledged that both experts, including Antoniadis's own expert, expressed the opinion that if Antoniadis had disclosed the amount of the Mellby offer to Spanninga, such disclosure would constitute a breach

35

of the standard of care and a breach of Antoniadis's fiduciary duties to Yancey.

However, the court concluded that Antoniadis did not, in fact, disclose the specific dollar amount of the Mellby offer to Spanninga:

> "Although both experts opined that Antoniadis breached the standard of care in one way, i.e., by disclosing Mel[l]by's $1.1 million offer to Spanninga without Yancey's consent, there was no evidence to support this opinion. In fact, the testimony from Spanninga and Antoniadis is to the contrary regarding the specific dollar amount."

Both Spanninga and Antoniadis testified that Antoniadis told Spanninga that he would have to offer more than he first indicated he was willing to offer, and also told Spanninga a dollar figure that he would have to offer to Yancey. At trial, Antoniadis engaged in the following colloquy with Yancey's attorney:

> "Q. You have a conversation with Mr. Spanninga while you are driving in the car?
>
> "A. Correct.
>
> "Q. And you tell him about the Mellby offer?
>
> "A. I—I told him, as I was leaving Craig Witt and Dr. Yancey, it's—he has to get into the game right now, that Dr. Yancey has decided to accept an offer.
>
> "Q. You told Mr. Spanninga there's another offer on Dr. Yancey's home?
>
> "A. That he's accepting.
>
> "Q. You said there's another offer on Dr. Yancey's home?
>
> "A. Correct.
>
> "Q. And you told Mr. Spanninga that the price of the offer was $1.1 million?

36

"A.  I said he has to make an offer, he has to get in the game now, because Dr. Yancey is accepting another offer.  And it has to be at least at 1.1, after he said —he said initially that he wanted to offer a million 60, at which point I interrupted and said it has to be 1.1."

Spanninga's testimony confirmed that Antoniadis told him the amount that he would have to offer.  Spanninga was asked, "Mr. Antoniadis did not recommend to you that you make, you make a purchase offer for $1.1 million?"  Spanninga answered, "I don't know how to characterize the conversation other than to say that we discussed the pricing and he said something to the effect, 'You have to go back to your old offer at 1-1,['] and that's the way we left it."  Spanninga followed up by stating, "[H]e said you have to get to the 1.1."

Thus, both Antoniadis and Spanninga testified that Antoniadis told Spanninga how much Spanninga should offer Yancey for the property.  However, their testimony does not support a finding that Antoniadis disclosed that the dollar figure that he told Spanninga to offer was the same amount as the Mellby offer.  Instead, the record supports the trial court's finding that Antoniadis did not disclose to Spanninga the dollar amount that Mellby had offered.  We therefore affirm the trial court's determination that because the evidence does not support a finding that Antoniadis told Spanninga the amount of the Mellby offer, Antoniadis could not be found to have breached his fiduciary duty to Yancey based on a disclosure of the terms of the Mellby offer.[9]

---

[9]  Antoniadis's conduct in telling Spanninga an exact amount to offer might have constituted a breach of the standard of care.  However, the experts were not asked whether such conduct would constitute a breach of the standard of care.  Rather, the

37

IV.

DISPOSITION

The judgment is affirmed.

_____
AARON, J.

WE CONCUR:


_____
O'ROURKE, Acting P. J.


_____
IRION, J.

---

experts were asked whether Antoniadis's disclosure of the exact amount of the Mellby offer to Spanninga would constitute a breach of the standard of care. The trial court correctly concluded that the record did not support the factual basis of the questions asked of the experts on this point.